2003 ME 128

**W. Gregg BOTKA et al.**

**v.**

**S.C. NOYES & CO., INC. et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 9, 2003.
Decided: Oct. 31, 2003.

---

David M. Sanders (orally), Livermore Falls, for plaintiffs.

Stephen E.F. Langsdorf (orally), Preti Flaherty Beliveau Pachios & Haley, LLC, Augusta, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] S.C. Noyes & Co. and L. Jean Noyes (SCN) appeal from a judgment entered, after a nonjury trial, by the Superior Court (Franklin County, *Gorman, J.*). The judgment awarded W. Gregg Botka and Geraldine Botka (the Botkas) $49,900 for unpaid commissions due on real estate sales; $2200 for overcharging on a lease between the parties; and $612.15 for overcharging for use of a fax machine. The judgment also denied relief on SCN's counterclaim for breach of contract and unpaid rents. SCN asserts that the Superior Court erred by (1) awarding commissions for direct sales of property by SCN to particular buyers when the property had not been "placed on the market"; (2) determining that SCN breached its lease agreement by overcharging the Botkas for rent and use of the fax machine; and (3) determining that SCN was not entitled to judgment on its counterclaim for breach of contract and rent due under SCN's lease to the Botkas. The Botkas cross-appeal asserting that the Superior Court (*Humphrey, J.*) erred in entering a summary judgment in favor of SCN on the Botkas' claim for intentional infliction of emotional distress.

[¶ 2] Because the contract provision entitling the Botkas to commissions is ambiguous, we vacate and remand for fact-finding as to whether commissions are due on three particular sales. In all other respects, we affirm the judgment.

I. CASE HISTORY

[¶ 3] This case arises out of what SCN characterizes as "a business relationship which turned sour." L. Jean Noyes is the president of S.C. Noyes & Co., a real estate and land development company operating in the Rangeley area. S.C. Noyes & Co. was established in the 1950s and since then has engaged in several business ventures, including purchase and development of tracts of land, sales of timber, and a real estate brokerage. The business was originally established by Mrs. Noyes' husband and was taken over by her after his death.

[¶ 4] In September 1996, SCN entered into an Asset Purchase and Business Relationship Agreement (Asset Purchase Agreement) with the Botkas. This agreement, drafted by an attorney representing SCN, transferred the real estate brokerage business of SCN to the Botkas. The agreement provided that SCN expected to continue "to be engaged in the real estate development business." The agreement also provided that Mrs. Noyes would act as the designated broker for the Botkas until one of the Botkas became qualified as

a designated broker, but no later than December 1997. Paragraph 14 of the agreement, the focus of the principal controversy in this case, provided that:

> 14. *Land Sales.* From time to time S.C.N. may place on the market certain parcels which it owns. So long as the lease for the Main Street office space remains in effect between these parties Botka will have exclusive right to sell the same at the present commission rate of 5%. Botka agrees to exercise the best professional diligence and its best conscientious efforts in attempting to find purchasers for the real estate that S.C.N. lists with Botka.

[¶ 5] In a separate document, the Botkas and SCN entered into a five-year lease permitting the Botkas to conduct their real estate business in the office space where the SCN real estate sales office had been located. The lease required the Botkas to pay $1000 rent per month and authorized SCN to adjust the rent annually to recognize tax, fuel, and utility cost increases. The agreement also required the Botkas to pay one-third of the fax and copier-related costs. After these agreements took effect, Mrs. Noyes, on behalf of SCN, signed exclusive right to sell agreements with the Botkas covering more than twenty parcels of real estate owned by SCN.

[¶ 6] After the first year of this arrangement, the relationship between Mrs. Noyes and the Botkas deteriorated. The Botkas asserted that Mrs. Noyes overcharged them for rent and use of the fax machine, harassed them in front of customers, interfered with sales relationships, and made working in the same building difficult, upsetting the Botkas and, on one occasion, resulting in a physical confrontation between Gregg Botka and Mrs. Noyes. The Botkas also asserted that on seven occasions, SCN had completed sales of real estate without paying the commissions required by the Asset Purchase Agreement.

[¶ 7] Ultimately, in December 1999, the Botkas filed a request for protection from harassment against Mrs. Noyes. After a discussion at the District Court (Farmington), the protection from harassment action was dismissed. To separate themselves from Mrs. Noyes, the Botkas returned all of the SCN property listings. Separately, the record indicates that Mrs. Noyes' attorney advised the Botkas that their lease would not be renewed and asked them to leave the premises before the expiration of the lease. The Botkas did so, purchasing a separate office and vacating the leased premises at SCN in October 2000.

[¶ 8] Previously, in April 2000, the Botkas had filed a four-count complaint against SCN alleging (1) intentional infliction of emotional distress; (2) violation of the Asset Purchase Agreement by nonpayment of commissions on certain properties sold directly to buyers by SCN; (3) a need for a declaratory judgment to establish the Botkas' rights under the lease in light of alleged interference with the free-use of space, overcharging for rent and use of the fax machine, and other disruptions of the Botkas' business activities; and (4) tortious interference with the Botkas' business relationships. In response, SCN filed a counterclaim alleging breach of the Asset Purchase Agreement by return of the listings of SCN's property. After the Botkas vacated the premises, the counterclaim was amended to add a breach of contract claim for failure to pay rents.

[¶ 9] SCN filed a motion for summary judgment on all counts of the Botkas' complaint. The Superior Court (*Humphrey, J.*), granted a partial summary judgment for SCN on the intentional infliction of emotional distress and tortious interference with business relationships claims.

The court dismissed the Botkas' request for declaratory judgment to declare rights under the lease because they had vacated the leased premises, and the business relationship between the parties had terminated.

[¶ 10] In resolving the intentional infliction of emotional distress claim, the court discussed the evidence of emotional distress addressed in the Botkas' statement of material facts. That statement asserted that Mrs. Noyes had (1) interfered with the Botkas' business activities; (2) frequently interrupted, berated, insulted, and harassed the Botkas alone or in front of clients or others; (3) initiated a physical confrontation with Gregg Botka; (4) acted imperiously; (5) threatened the Botkas with eviction from the premises and disrupted their use of the premises; and (6) directed the Botkas not to sell SCN properties to people of color. The summary judgment court determined that this conduct and the resulting stress it caused to the Botkas "although inappropriate, does not rise to the level of 'extreme and outrageous' and is insufficient to support the plaintiffs' claim of infliction of emotional distress."

[¶ 11] After the summary judgment ruling, the Botkas amended their complaint to restate a count for failure to pay commissions and to assert violations of the Asset Purchase and Lease Agreements that had increased their rent and fax machine costs and otherwise caused them to relocate at substantial cost.

[¶ 12] After a three-day nonjury trial, the Superior Court (*Gorman, J.*) entered judgment in favor of the Botkas on their breach of contract claims, and on SCN's counterclaims. Specifically, the court found that (1) Mrs. Noyes had breached the lease contract by interfering with the

Botkas' use and quiet enjoyment of the leased space and their ability to conduct their business on the premises; (2) Mrs. Noyes' breach of the contract justified the Botkas' terminating the lease and supported judgment for the Botkas on SCN's counterclaim; (3) the Botkas had proven overcharges for rent and the fax machine, which were breaches of the lease contract entitling the Botkas to $2200 for overcharges on rent, and $612.15 for overcharges on the fax machine; (4) SCN's direct sales of some parcels of land were a material breach of paragraph 14 of the Asset Purchase Agreement, which the court viewed as unambiguous in requiring that sales of property by SCN be processed exclusively through the Botkas; and (5) Mrs. Noyes, while acting as a broker licensed through the Botkas' real estate agency, had brokered a third party sale of real estate without providing a commission to the Botkas.

[¶ 13] In its findings, the court identified three direct sales of land, having a total value of $570,000, for which no commissions had been paid. These were sales to International Paper Corp., Jordan Landing Partnership, and Hall and Sorensen.[1] The court found that in three other instances SCN had engaged in direct sales, without paying commissions, of properties which had been on the market and which, prior to sale, SCN had taken off the market or removed from listing with the Botkas. These parcels, with a total value of $195,000, involved sales to Axelson (two parcels) and Keep. Finally, the court found that while Mrs. Noyes was "licensed to act as a broker only through the Botkas' agency," she had brokered a third party sale for $225,000, but provided no commission to the Botkas. The court determined that

---

1. The court characterized these properties as "marketed." However, there is no indication that these three properties were ever listed for sale or offered for sale on the open market.

the Botkas were entitled to commissions of $49,900 on these seven sales.

[¶ 14] SCN appealed from this judgment. The Botkas cross-appealed from the summary judgment court's ruling on the intentional infliction of emotional distress claim.

## II. LEGAL ANALYSIS

### A. SCN's Counterclaim and the Breach of the Lease Findings

[¶ 15] When facts found after trial are challenged on appeal, we review the record in the light most favorable to the trial court's judgment to determine if the findings are supported by competent evidence. *Acadia Ins. Co. v. Keiser Indus., Inc.,* 2002 ME 57, ¶ 14, 793 A.2d 495, 498. Any ambiguities are resolved in favor of the judgment. *State v. Haven,* 2002 ME 38, ¶ 3, 791 A.2d 938, 939. A similar standard of review applies to damages findings. *Jenkins, Inc. v. Walsh Bros., Inc.,* 2001 ME 98, ¶ 18, 776 A.2d 1229, 1235–36. A damages award based on a judgmental approximation is proper where the evidence establishes facts from which the amount of damages may be determined to a probability. *Id.; Merrill Trust Co. v. State,* 417 A.2d 435, 440–41 (Me.1980). In this record, there is more than sufficient evidence to support the trial court's findings that SCN breached the lease agreement by disrupting and interfering with the Botkas' quiet enjoyment of the premises and their business activities. These findings support the court's judgment in favor of the Botkas on SCN's counterclaim to enforce provisions of the lease.

[¶ 16] Separately, there is sufficient evidence in the record to support the court's findings that SCN had overcharged the Botkas in its adjustments of the rent and in its assessment of costs for the fax machine. The amounts found as damages for these overcharges, $2200 and $612.15 respectively, are fully supported by the record.

### B. Cross Appeal: Intentional Infliction of Emotional Distress

[¶ 17] To prevail in an action for intentional infliction of emotional distress, a plaintiff must prove, by a preponderance of the evidence, that (1) the defendant engaged in intentional or reckless conduct that inflicted serious emotional distress or would be substantially certain to result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable; and (3) the plaintiff suffered serious emotional distress as a result of the defendant's conduct. *Curtis v. Porter,* 2001 ME 158, ¶ 10, 784 A.2d 18, 22–23; *Champagne v. Mid–Maine Med. Ctr.,* 1998 ME 87, ¶ 15, 711 A.2d 842, 847. Serious emotional distress means emotional distress, created by the circumstances of the event, that is so severe that no reasonable person could be expected to endure it. *Curtis,* 2001 ME 158, ¶ 10, 784 A.2d at 22–23; *Champagne,* 1998 ME 87, ¶ 15, 711 A.2d at 847.

[¶ 18] Entry of a summary judgment on an issue is appropriate only if, with respect to that issue, there are no disputes of material facts such that the moving party is entitled to a judgment as a matter of law. *Champagne,* 1998 ME 87, ¶ 5, 711 A.2d at 844. The existence of a dispute of material facts and entry of summary judgment are questions of law which we review de novo, considering the evidence in the light most favorable to the party against whom judgment has been entered, to decide whether the parties' statements of material facts and the referenced record evidence reveal a genuine issue of material fact, and whether the moving party was

entitled to judgment as a matter of law. *Rivers v. Amato,* 2003 ME 87, ¶ 6, 827 A.2d 827, 829; *Doyle v. Dep't of Human Servs.,* 2003 ME 61, ¶ 8, 824 A.2d 48, 52–53.

[¶ 19] The Botkas invite us to review, on the summary judgment question, not only their statement of material facts, but additional matter in the record not presented in their statement of material facts, including the trial record. That broader record reveals, particularly with regard to Geraldine Botka, a significantly greater level of emotional distress than indicated by the statement of material facts that was before the summary judgment court pursuant to M.R. Civ. P. 56(h). Such a review of the record, outside the statement of material facts, is not appropriate in testing the propriety of a ruling on a motion for summary judgment. M.R. Civ. P. 56(h)(4). *See also Levine v. R.B.K. Caly Corp.,* 2001 ME 77, ¶ 9, 770 A.2d 653, 656. With our review limited to the facts presented in the statements of material facts, the summary judgment court's determination that the facts presented did not rise to the level of "extreme and outrageous" behavior and were insufficient to support the claim for intentional infliction of emotional distress was not error.

C. The Commissions on Sales

[¶ 20] The record fully supports the trial court's finding that SCN engaged in direct sales of property to particular buyers for property values totaling $773,500. SCN argues that some of these property transactions were not sales, but were exchanges or other tax-exempt property transfers on which there would be no entitlement to commissions. This was a disputed fact on which the trial court found against SCN. The evidence supports the trial court's findings that these transaction were sales, each of which, the record suggests, was reported in real estate transfer tax document filings required by 36 M.R.S.A. §§ 4641–4641–L (1990 & Supp. 2002)—filings which are highly indicative that the subject transactions were indeed sales.

[¶ 21] The trial court interpreted the Asset Purchase Agreement, paragraph 14, as an unambiguous provision requiring that any sale of SCN properties triggered the Botkas' entitlement to a commission on the sale. Whether language in a contract or other document is ambiguous is a question of law that we review de novo. *Bangor Publ'g Co. v. Union St. Mkt.,* 1998 ME 37, ¶ 6, 706 A.2d 595, 597. We will view contract language as ambiguous if it is reasonably susceptible to different interpretations. *Lee v. Scotia Prince Cruises Ltd.,* 2003 ME 78, ¶ 9, 828 A.2d 210, 213; *Am. Prot. Ins. Co. v. Acadia Ins. Co.,* 2003 ME 6, ¶ 11, 814 A.2d 989, 993.

[¶ 22] The interpretation placed upon paragraph 14 by the trial court is a reasonable interpretation, particularly if one focuses on the "exclusive right to sell" language. However, that interpretation is not the only reasonable interpretation of paragraph 14. In other provisions of the Asset Purchase Agreement, SCN reserved to itself the capacity to continue to engage in real estate development activities. The first sentence of paragraph 14 states: "From time to time S.C.N. may place on the market certain parcels which it owns." This sentence may be interpreted, as the trial court interpreted it, to mean: "From time to time SCN may offer for sale." However, the sentence may also be interpreted to mean that from time to time SCN may place certain properties on the open market for sale to any qualified purchaser. This interpretation could be viewed as reserving to SCN the right to engage in private, negotiated sales or transfers with individual parties, outside

the open market of properties available to any qualified purchaser.

[¶ 23] This alternative interpretation finds support in the third sentence of paragraph 14: "Botka agrees to exercise the best professional diligence and its best conscientious efforts in attempting to find purchasers for the real estate that S.C.N. lists with Botka." This sentence suggests a listing of properties for open market sale to any qualified buyer, not sales that may occur in direct dealings between SCN and individual purchasers. Such direct purchasers could not be purchasers of listed properties whom the Botkas would be obligated to exercise their "best professional diligence" in "attempting to find."

[¶ 24] Thus, with respect to some parcels, the court's judgment must be vacated and the matter remanded for findings as to the proper interpretation of the ambiguity in paragraph 14. However, not all of the sales on which the trial court found that the Botkas were entitled to commissions must be reconsidered on remand in light of the ambiguity. The trial court found that three properties, two lots sold to Axelson and one lot sold to Keep, were properties which SCN had placed "on the market" and then taken "off the market" as a predicate to the sale. Regardless of how the ambiguity in paragraph 14 is interpreted, the Botkas would be entitled to five percent commissions on these three sales. The trial court's findings establish that these properties had been on the open market for sale, the interpretation of the ambiguity urged by SCN.

[¶ 25] Separately, at a time when Mrs. Noyes was licensed to act as a broker only through the Botkas' agency, Mrs. Noyes brokered the sale of a parcel owned by the Szetelas to Axelson for $225,000. SCN attempts to characterize this sale as a transfer to assist the Szetelas by relieving them of their mortgage debt to SCN.

However, such a transaction is like many real estate sales with a new buyer purchasing a property and, thereby, relieving the previous owner of a burdensome mortgage debt. That is a common occurrence in the real estate business. It is a sale of real estate upon which the Botkas' agency, through whom Mrs. Noyes was licensed, was entitled to its share of a commission. This entitlement, like the entitlement to the commissions on the sales of properties withdrawn from the market prior to sale, is unaffected by the ambiguity in paragraph 14. It is a third party transaction, not a sale of SCN property addressed by paragraph 14.

[¶ 26] For the remaining sales, the judgment, to the extent it covered commissions on those sales, must be vacated and remanded for further fact-finding to resolve the ambiguity in paragraph 14 and to make appropriate disposition of the commission claims based on resolution of that ambiguity.

The entry is:

Judgment vacated with regard to the commissions on the SCN sales of land to International Paper Corporation, Jordan Landing Partnership, and Hall and Sorenson. In all other respects, the judgment is affirmed. Remanded to the Superior Court for further proceedings in accordance with this opinion. No costs to either party except that the Botkas shall be entitled to post-judgment interest, pursuant to M.R.App. P. 13(e), on the amount of the trial court's award of judgment which is affirmed by this opinion.