2005 ME 71

**Alan MORISON et al.**

v.

**WILSON LAKE COUNTRY CLUB et al.**

Supreme Judicial Court of Maine.

Argued: April 26, 2005.

Decided: June 15, 2005.

Roy T. Pierce, Esq. (orally), Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, for plaintiffs.

James G. Goggin, Esq., Valerie A. Wright, Esq. (orally), Verrill & Dana, LLP, Portland, for Wilson Lake Country Club.

Frank M. Underkuffler, Esq. (orally), Farmington, for Wilson Lake Members Corp.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] The Wilson Lake Country Club, a for-profit Maine corporation, and the Wilson Lake Members Corporation, a Maine nonprofit corporation, appeal a judgment of the Superior Court (Franklin County, *Jabar, J.*) finding that the Wilson Lake Country Club's board of directors violated both the Maine Business Corporation Law and the Club's bylaws by transferring 715 shares of treasury stock to the Wilson Lake Members Corporation. The Wilson Lake Country Club asserts that the Superior Court erred in finding that (1) it did not receive consideration for the stock transfer, and (2) the transfer of 715 shares of treasury stock to the Wilson Lake Members Corporation violated Article 18 of the Wilson Lake Country Club's bylaws, prohibiting the issuance of more than one share of stock to any one individual. Because the trial court's findings are supported by the record, and the trial court correctly applied the governing law to the facts it found, we affirm the judgment.

## I. CASE HISTORY

[¶ 2] There is no dispute about the basic facts of the case. The Wilson Lake Country Club (the Club) operates a nine-hole, publicly accessible golf course in Wilton. The Club was incorporated in 1931 as a for-profit corporation for "the promotion and advancement of the game of golf and other athletic sports, and the maintenance of a club house and grounds in the County of Franklin and State of Maine, for the use of the members of the Club."

[¶ 3] The Club's certificate of organization authorizes it to issue 2500 shares of common stock having a par value of $10 per share. At a. meeting in 1990, the Club's stock and bylaw committees reported that there was a need for "a cap" on the number of shares sold "to any one member." Accordingly, the Club's board of directors passed a motion limiting the number of shares the Club could sell to one person to twenty-five shares. Later in 1990, the board voted that the Club would "only sell stock to members." During this time, new members were issued twenty-five shares each, existing members were issued the number of shares necessary to bring their total shares to twenty-five, and those members who already had more than twenty-five shares maintained their shares.

[¶ 4] Approximately a year and a half later, the board informed the shareholders that it proposed to change Article 18 of the Club's bylaws so that the maximum number of shares issued by the Club to any one person would be one rather than twenty-five. The board reported to the shareholders that it was proposing this change to Article 18 of its bylaws because it had "become apparent that the majority" of the "stockholding members were unaware that a change had been made in the past." [1] At a shareholders meeting held

---

1. The Superior Court noted that:

   because other existing shareholders had not been provided the opportunity to acquire a proportion interest in the new shares issued, the stock certificates were returned to the Club and the Club repaid the members the $10 per share they had paid. The new members who had purchased blocks of twenty-five shares were then issued single shares of stock.

   According to testimony in the record, the board made the decision to issue only one share per member after a group of members attempted a "takeover" of the Club by getting

on December 14, 1991, the shareholders approved the amendment to Article 18, requiring the Club to "issue stock only to members of the Club" and "not issue more than one (1) share of stock to any one individual."

[¶ 5] In the Club's recent history, some of the Club's members had wanted to change the corporate structure so that active members of the Club would be in control of the Club, instead of inactive members, or shareholders acting with proxies of inactive members. Attorneys the Club had consulted, on four occasions, indicated that, in order to legally change the corporate structure, the Club would first need to obtain the necessary votes from shareholders.

[¶ 6] In June 2002, there was discussion at a board meeting about selling stock to the Wilson Lake Members Corporation (WLMC) "to prevent the possibility of an individual suing" because the individual believed his or her share was currently "worth more than $10."

[¶ 7] The WLMC is a nonprofit corporation that was established in 1996 by a few members of the Club. The WLMC itself is not a "member of the Club." In its bylaws, the WLMC states that its purpose is to:

> provide Wilson Lake Country Club members with a vehicle in which, in association with other Wilson Lake Country Club Shareholders, to hold stock, limited powers of attorney for voting rights and/or proxies in said WLCC. The Wilson Lake Members Corporation is comprised only of dues paying members of the WLCC who have signified a desire to be a member of the said Members Corporation by complying with the

membership requirements detailed herein.

[¶ 8] In July 2002, the Club's board of directors approved the transfer of 715 shares of the Club's treasury stock to the WLMC. The board did not state any reason for the transfer in the minutes of the meeting at which it voted to transfer stock to the WLMC. The Club did not receive any money in exchange for this stock transfer. All four of the board members who voted in favor of the transfer were members of the WLMC. With possibly one exception, for the ten years preceding the July 2002 transfer, no more than 577 shares had been voted at any one of the Club's shareholder meetings. Thus, the effect of the transfer was to shift control of the Club from its shareholders to the WLMC and its board.

[¶ 9] In August 2002, at a meeting of the Club's board of directors, Alan Morison brought a motion to rescind the transfer of stock to the WLMC. The board of directors rejected Morison's motion. The five board members who voted against Morison's motion were all members of the WLMC.

[¶ 10] In September 2002, six of the Club's shareholders commenced this action against the Club and the WLMC seeking a declaratory judgment that the July 2002 stock transfer was null and void because it (1) violated the requirements of the Maine Business Corporation Act, and (2) violated the Club's bylaws.

[¶ 11] A jury-waived trial was held in May 2004. In June 2004, the Superior Court, in a carefully considered and well-reasoned opinion, found that the July 18, 2002, stock transfer was null and void be-

"their friends to buy 25 shares of stock." Another group then found out about the

"tried takeover" and blocked it.

cause it violated 13–A M.R.S.A §§ 506(3), 507(1) (1981),[2] as well as the Club's bylaws. The court also ordered the WLMC to return to the Club the 715 shares of stock WLMC received pursuant to the July 18, 2002, stock transfer.

[¶ 12] The court made the following findings in support of its decision: (1) the WLMC was established for the purpose of receiving shares from the Club to gain control over the Club; (2) certain members of the Club wanted to gain control of it because "they were unhappy with the direction of the Corporation as controlled by the shareholders of the Corporation"; (3) the transferred stock in question was "treasury stock"; (4) the transfer of treasury stock on July 18, 2002, was "no different from 'reissuing' the stock"; (5) although the board of directors has authority to run the Club, it gets this authority from the shareholders; (6) the directors did not have the authority to affect the ownership structure of the Club without the approval and consent of the shareholders; and (7) there was no consideration for the transfer.

[¶ 13] The Club and the WLMC then brought this appeal.

**2.** Sections 506 and 507 of title 13–A were repealed and replaced by P.L.2001, ch. 640 §§ A–1, A–2 (effective July 1, 2003) as part of enactment of title 13–C M.R.S.A., a new Maine Business Corporation Act, replacing title 13–A. Because the transactions at issue here all occurred prior to July 1, 2003, they are governed by the provisions of 13–A M.R.S.A. §§ 506, 507 (1981).

**3.** The applicable provisions of the Business Corporation Act, 13–A M.R.S.A. §§ 501–525, were repealed and replaced by P.L.2001, ch. 640, §§ A–1, A–2 (effective July 1, 2003). Title 13–A M.R.S.A. §§ 501–525 is applicable here because it was in effect on July 18, 2002, when the stock transfer occurred. Title 13–A M.R.S.A. § 507(1) provided that:

## II.  LEGAL ANALYSIS

[¶ 14] We review the record in the light most favorable to the trial court's judgment to determine if its factual findings are supported by competent evidence. *Botka v. S.C. Noyes & Co.,* 2003 ME 128, ¶ 15, 834 A.2d 947, 952. If any ambiguities exist, they are resolved in favor of the judgment. *Id.* We review "decisions regarding the meaning of a statute de novo" because statutory construction is a matter of law. *Austin v. Austin,* 2000 ME 61, ¶ 8, 748 A.2d 996, 1000. When interpreting a statute, we look first to the "plain meaning of the statutory language as a means of effecting the legislative intent," but we "will not construe statutory language to effect absurd, illogical, or inconsistent results." *Id.* (quoting *Coker v. City of Lewiston,* 1998 ME 93, ¶ 7, 710 A.2d 909, 910).

### A.  The Business Corporation Act

[¶ 15] The Superior Court's finding that the Club did not receive consideration in exchange for the stock transfer is not, according to the Club, a finding of fact, but rather a legal conclusion subject to de novo review.

[¶ 16] Pursuant to 13–A M.R.S.A. § 507(1) (1981),[3] a corporation's board of

[e]xcept to the extent that the articles of incorporation or the bylaws otherwise provide, the directors of a corporation shall have authority to issue from time to time any part or all of the authorized but unissued shares or dispose of the treasury shares of the corporation, and determine the time when, the terms and conditions upon which, and the consideration for which, the corporation shall issue or dispose of such shares.

In addition, pursuant to 13–A M.R.S.A. § 506(3) (1981), "[t]reasury shares may be disposed of by the corporation for such consideration as may be fixed from time to time by the board of directors, or by the shareholders if the articles of incorporation so provide."

directors had authority to issue or dispose of the corporation's treasury shares[4] and to determine the "terms and conditions upon which, and the consideration for which, the corporation shall issue or dispose of such shares." Further, "[i]n the absence of fraud or bad faith in the transaction, the judgment of the board of directors ... as to the value of the consideration received for shares, shall be conclusive." 13–A M.R.S.A. § 507(4) (1981).

[¶ 17] The Club argues that the Superior Court misinterpreted both 13–A M.R.S.A. § 507(4) and the common law business judgment rule when it failed to give deference to the board of directors' judgment that adequate consideration was received for the July 18, 2002, stock transfer. According to the Club, the board of directors determined that there was adequate consideration for the transfer because the transfer helped the Club to achieve its long-term goal of putting "control of the Club back in the hands of the active dues-paying members," by creating a one vote per member voting model, eliminating the prospect of proxy fights, preserving value in stock, and avoiding risks of a "hostile" takeover.

[¶ 18] Neither the Club nor the plaintiffs dispute the trial court's conclusion that "consideration received for treasury shares need not be in the form of money, property, labor, or services, and the judgment as to the value of consideration received for

treasury stock is committed to the discretion of the corporation's board." *See* 13–A M.R.S.A. §§ 506(3), 507(1); *Bissias v. Koulovatos,* 2000 ME 189, ¶ 7, 761 A.2d 47, 49. The issue in dispute here is whether the court erred, as a matter of law, by finding that the Club's board of directors transferred treasury shares without receiving any consideration. A transfer of treasury stock without any consideration violated 13–A M.R.S.A. §§ 506(3), 507(1).[5]

[¶ 19] The Superior Court's finding that the Club did not receive consideration for the stock transfer is fully supported by the record. The transfer did not result in restructuring the Club from a for-profit to a nonprofit corporation, nor did it change the Club's voting structure to a one vote per active member voting model. The purported "consideration" asserted by the Club and the WLMC is simply a shift in voting control of the Club from the Club's shareholders to the WLMC. Such a transfer of control away from shareholders to an outside entity, without any payment or benefit to the Club in return is not the consideration required by sections 506(3) and 507(1).

## B. The Corporate Bylaws

[¶ 20] If the bylaws of a private association are "not unreasonable, nor contrary to public policy nor to constitutional or statutory requirements," they are " 'a valid enforceable contract between mem-

---

4. Treasury shares, as defined by 13–A M.R.S.A. § 102(24) (1981), were:

   shares of a corporation which have been issued, have been subsequently acquired by the corporation, and have not, either by reason of the acquisition or otherwise, been cancelled or retired. Such shares shall be deemed to be issued, but they shall not be considered as an asset or liability of the corporation, nor as outstanding for dividend, quorum, voting or any other purposes.

5. Title 13–A M.R.S.A. § 506(3) (1981) provided that "treasury shares may be disposed of by the corporation for such consideration ...." Title 13–A M.R.S.A. § 507(1) provided that "the directors of a corporation shall have authority to ... dispose of the treasury shares of the corporation, and determine the ... consideration for which, the corporation shall ... dispose of such shares."

bers and the association ... [which] govern their mutual rights and responsibilities.' " *Gashgai v. Me. Med. Ass'n*, 350 A.2d 571, 575 (Me.1976) (quoting *Libby v. Perry*, 311 A.2d 527, 532 (Me.1973)).

[¶ 21] Article 18 of the Club's bylaws states that "[t]he corporation may issue stock only to members of the Club," and "the corporation shall not issue more than one (1) share of stock to any one individual." The Club argues that: (1) the term "issue" in Article 18 is a term that cannot be reasonably interpreted to include a transfer or disposal of treasury shares; and (2) the term "individual" in Article 18 cannot be reasonably interpreted to include the WLMC, and thus there is no limitation on the number of shares that may be transferred to a corporate entity like the WLMC.

[¶ 22] The Superior Court properly concluded that the limitation to issuance of not more than one share of stock to any one individual, could not be avoided by transfers of multiple shares of stock to corporate entities. In this context the term "individual" includes both natural persons and corporate entities.

The entry is:

Judgment affirmed.