STATE OF MAINE
CUMBERLAND, ss

CAMDEN NATIONAL BANK,

        Plaintiff/Counterclaim
        Defendant,

        v.

D & F PROPERTIES, LLC, DUMONT'S
PIT STOP, INC., DUANE J. DUMONT,
and FRANCES DUMONT,

        Defendants/Counterclaim
        Plaintiffs/Cross-claim
        Plaintiffs,

COASTAL ENTERPRISES, INC.,

        Party-in-Interest/Cross-claim
        Defendant,

and

U.S. SMALL BUSINESS
ADMINISTRATION,

        Party-in-Interest

---

D & F PROPERTIES, LLC, DUMONT'S
PIT STOP, INC., DUANE J. DUMONT,
and FRANCES DUMONT,

        Third-party Plaintiffs,

        v.

DIANE McMANUS and SUZANNE
UMLAND,

        Third-party Defendants

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-WB-RE-10-16
JCN - CUM - 9/30/2011

) John Montgomery
) Bernstein Shur
)
)
)
)
)
) Karen Wolfram
) Daniel G. Lilley law office
)
)
)
)
) Marshall Tinkle
) Hirshon Law Group
)
) **ORDER**
) (Motion to Strike Jury Trial)
)
) Mark O'Brien
) US. Small Business Admin.
)
) Karen Wolfram
) Daniel G. Lilley Law Office
)
)
)
) Diane McManus: John Montgomery
) Bernstein Shur
)
) Suzanne Umland: Marshall Tinkle
     Hirshon Law Group

STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-WB-RE-10-16

CAMDEN NATIONAL BANK,                        )
                                             )
            Plaintiff/Counterclaim           )
            Defendant,                        )
                                             )
      v.                                      )
                                             )
D & F PROPERTIES, LLC, DUMONT'S              )
PIT STOP, INC., DUANE J. DUMONT,             )
and FRANCES DUMONT,                          )
                                             )
            Defendants/Counterclaim          )
            Plaintiffs/Cross-claim           )
            Plaintiffs,                       )
                                             )
COASTAL ENTERPRISES, INC.,                   )
                                             )
            Party-in-Interest/Cross-claim    )
            Defendant,                        )
                                             )
and                                          )               **ORDER**
                                             )        (Motion to Strike Jury Trial)
U.S. SMALL BUSINESS                          )
ADMINISTRATION,                              )
                                             )
            Party-in-Interest                )
_____             )
                                             )
D & F PROPERTIES, LLC, DUMONT'S              )
PIT STOP, INC., DUANE J. DUMONT,             )
and FRANCES DUMONT,                          )
                                             )
            Third-party Plaintiffs,          )
                                             )
      v.                                      )
                                             )
DIANE McMANUS and SUZANNE                     )
UMLAND,                                       )
                                             )
            Third-party Defendants           )
                                             )

Camden National Bank and Diane McManus move to strike the jury-trial demand on the counterclaims and third-party claims brought by D & F Properties, LLC, Dumont's Pit Stop, Inc., Duane J. Dumont, and Frances Dumont (collectively, "the Dumont parties"), based on ten jury waivers signed by the Dumont parties in their various capacities over the course of their business relationship with the Bank.

The first five jury waivers (the "2006 waivers") signed by the Dumont parties relate to a 2006 loan in the amount of $195,900 made by the Bank to the Dumont parties. Four of these waivers are essentially identical, and only vary as to whether the Dumonts were acting as the borrowers or guarantors in the note (Exh. 1) and personal guaranties (Exhs. 2-4). These waivers provide:

> It is mutually agreed by the Bank, the Debtor and the Guarantor that the Bank, the Debtor and the Guarantor shall, and hereby do, waive trial by jury in any action, proceeding, counterclaim, objection to claim in a bankruptcy case or other litigation of any type brought by the Bank, the Debtor or the Guarantor against any of the others on any matter whatsoever arising out of, related to, or in any way connected with this Guaranty and/or the transactions or documents contemplated hereby.

(Exh. 2 at 4; Exh. 3 at 5; Exh. 4 at 5.) The fifth jury waiver is in the mortgage related to the 2006 loan, and provides:

> GRANTOR HEREBY IRREVOCABLY AND UNCONDTIONALLY WAIVES AND GRANTEE, BY ITS ACCEPTANCE OF THE NOTE, IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR COUNTERCLAIM ARISING IN CONNECTION WITH, OUT OF, OR OTHERWISE RELATING TO THE LOAN, THE NOTE, THIS MORTGAGE, OR ANY OTHER OF THE LOAN DOCUMENTS.

(Exh. 5 at 19.)

The next four jury waivers (the "2007 waivers") signed by the Dumont parties relate to a 2007 loan in the amount of $20,000 made by the Bank to the Dumont parties. Similar to the

2006 note and guaranties, these four waivers are essentially identical, and again only vary as to whether the Dumonts were acting as borrowers or guarantors in the note (Exh. 6) and personal guaranties (Exhs. 7-9.) The waivers provide:

> Guarantor hereby expressly and voluntarily waives and an all rights whether arising under the Maine constitution, and any Rules of Civil Procedure, common law or otherwise, to demand a trial by jury in any action, suit, proceeding or counterclaim involving Lender as to any matter, claim or cause of action whatsoever *arising out of or in any way related to any agreement or loan with Lender or any of the transactions contemplated between the parties.*

(Exh. 7 at 1; Exh. 8 at 1; Exh. 9 at 1 (emphasis added).)

Finally, the jury waiver in the commitment letter sent by the Bank to the Dumonts related to the unconsummated 2009 loan (the "2009 waiver") provides: "Borrower and each Guarantor hereby expressly waives trial by jury *in any action, proceeding or counterclaim brought by Bank* against all or any one of them based upon, arising out of, or connected with this Commitment or any other document executed in connection with the Loan." (Exh. 10 at 10 (emphasis added).) Based on these waivers, the Bank and McManus contend that the Dumont parties have waived their right to a jury trial in their counterclaims and third-party claims against them. (M. Strike 4-7.)

At oral argument the parties agreed that the proper analysis for the Court to apply is that set forth in *Medical Air Technology Corp. v. Marwan Investment, Inc.*, 303 F.3d 11 (1st Cir. 2002). Noting that "[t]here is a presumption against denying a jury trial based on waiver, and waivers must be strictly construed," the first step is to determine whether the plain language of the waiver "unambiguously covers the claims asserted." *Id.* at 18-19. If "a contractual jury waiver does encompass the asserted claims, courts will not enforce the jury waiver unless it was entered into knowingly and voluntarily." *Id.* at 19. Whether a jury waiver has been entered into knowingly and voluntarily is based on the totality of the circumstances at the time the parties

signed the agreement, including factors such as "the waiving party's education and business experience, the respective roles of the parties in determining the terms of the waiver, the amount of time the waiving party had to consider the waiver, whether the waiving party was represented by counsel," and consideration for the waiver. *Id.* at 19 n.4.

In the present case, the counterclaims and third-party claims asserted by the Dumont parties all relate to the failed 2009 loan transaction, and were asserted in response to the Bank's foreclosure action on the 2006 and 2007 notes. Based on the plain language of the 2006 waivers, the Court concludes that those waivers do not encompass the counterclaims and third party claims asserted. The waivers within the note, guaranties, and mortgage limit their applicability to the subject transaction, i.e. the 2006 loan, and do not extend to any other transaction between the parties. Similarly, the 2009 waiver also does not encompass the asserted counterclaims and third-party claims. The 2009 waiver specifically limits its application to "any action, proceeding or counterclaim brought by Bank"; the waiver does not apply to actions, proceedings, or counterclaims brought by the Dumont parties. Thus, the only waivers that could potentially limit the Dumont parties' right to a trial by jury are the 2007 waivers.

The 2007 waivers prohibit a jury trial "in any action, suit, proceeding or counterclaim involving Lender as to any matter, claim or cause of action whatsoever arising out of or in any way related to any agreement or loan with Lender or any of the transactions contemplated between the parties." The Bank and McManus contend that the 2007 waivers prohibit a jury trial on the Dumont parties' counterclaims and third-party claims because 1) the counterclaims were brought in response to a foreclosure action on the 2007 note, and 2) the plain language states that the waiver applies to "any action whatsoever arising out of or in any way related to any agreement or loan with Lender."

The Bank's arguments are unavailing.  As noted, jury trial waivers must be strictly construed because they involve the relinquishment of a fundamental right.  *See Medical Air Technology Corp.*, 303 F.3d at 18.  Simply stated, neither the 2007 waivers, nor any other waiver signed by the Dumont parties, expressly provides for the waiver of a right to a trial by jury for all future transactions.  Indeed, had Camden National Bank and Diane McManus considered the 2007 waivers to apply to all future transactions, they would have had no need to include a waiver in the documentation prepared in connection with the proposed 2009 transaction.  The Court concludes, therefore, that the Dumont parties have not waived their right to a trial by jury on the issues generated by the counterclaims that they have asserted in this action.

Based on the foregoing analysis, the Court denies the motion to strike jury trial filed by Camden National Bank and Diane McManus.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Order into the docket by reference.

Date:  9/29/11

_____
Justice, Maine Business & Consumer Court

STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-WB-RE-10-16
JCN-CUM - 10/5/2011

CAMDEN NATIONAL BANK,   )
                        )
    Plaintiff/Counterclaim   )
    Defendant,          )
                        )
    v.                  )
                        )
D & F PROPERTIES, LLC, DUMONT'S   )
PIT STOP, INC., DUANE J. DUMONT,   )
and FRANCES DUMONT,     )
                        )
    Defendants/Counterclaim   )
    Plaintiffs/Cross-claim   )
    Plaintiffs,         )
                        )
COASTAL ENTERPRISES, INC.,   )
                        )
    Party-in-Interest/Cross-claim   )
    Defendant,          )
                        )
and                     )
                        )
U.S. SMALL BUSINESS     )
ADMINISTRATION,         )
                        )
    Party-in-Interest   )
_____   )
                        )
D & F PROPERTIES, LLC, DUMONT'S   )
PIT STOP, INC., DUANE J. DUMONT,   )
and FRANCES DUMONT,     )
                        )
    Third-party Plaintiffs,   )
                        )
    v.                  )
                        )
DIANE McMANUS and SUZANNE   )
UMLAND,                 )
                        )
    Third-party Defendants   )
                        )

**ORDER**
(Motion for Judgment on the Pleadings)

Camden National Bank (the Bank) and Diane McManus (McManus) move for judgment on the pleadings, pursuant to M.R. Civ. P. 12(c), and dismissal of the counterclaims and third-party claims brought by D & F Properties, LLC, Dumont's Pit Stop, Inc., Duane J. Dumont, and Frances Dumont (collectively, "the Dumont parties" or "Defendants") against them. The Court held oral argument on this motion on August 26, 2011.

## BACKGROUND

The Dumonts have had an established relationship and a course of dealing with the Bank and McManus since at least 2006. (Counterclaim ¶ 17.) In 2006, the Bank, Coastal Enterprises, Inc. (CEI), and the Small Business Administration (SBA) funded the Dumonts' purchase of commercial real estate in Monmouth (the "Monmouth property") upon which the Dumont parties operated the Pit Stop, a convenience store and gas station. (Counterclaim ¶¶ 15, 18.) McManus served as the Dumonts' loan representative on behalf of the Bank. (Counterclaim ¶ 19.) On December 5, 2006, D & F Properties executed two promissory notes in favor of the Bank: one, in the amount of $195,000, was secured by a first mortgage on the Monmouth property, and the second, in the amount of $117,300, was secured by a second mortgage on the Monmouth property. (Counterclaim ¶ 24.) The Dumonts and Pit Stop signed personal guaranties on these loans on the same day. (Counterclaim ¶ 26.) On February 28, 2007, Pit Stop executed a promissory note in favor of the Bank for a $20,000 line of revolving credit, secured by various personal and corporate guaranties of the Dumont parties, a blanket filing on all business assets, and a mortgage deed and assignment of rents. (Counterclaim ¶ 29.)

After the close of the 2006 transactions, Duane Dumont would meet with McManus at the Bank whenever he was in the area to keep her up to date on the business. (Counterclaim ¶ 30.) In the summer of 2008, Defendants contacted CNB and McManus for an additional loan to

2

fund renovations on the Monmouth property, including converting the full-serve pumps to self-serve. (Counterclaim ¶ 34.) McManus set up a meeting at the property with Duane Dumont and Suzanne Umland on behalf of CEI, at which meeting Duane Dumont presented his plan for the renovations. (Counterclaim ¶¶ 35-36.) Both McManus and Umland represented that they were on board to loan Defendants the estimated $200,000 for renovations. (Counterclaim ¶ 36.)

Over the next several months, in reliance on these representations, Duane Dumont obtained Planning Board approval and the necessary surveys, and prepared a formal business plan. (Counterclaim ¶ 37.) Duane Dumont kept McManus informed as to the status of the renovation project and presented a completed business plan to her on or about late March or early April of 2009. (Counterclaim ¶¶ 39, 41.) After reviewing the business plan, McManus told Duane Dumont that "We are going to do it." (Counterclaim ¶ 41.) McManus promised that the Bank would provide the funding for the renovations and that she would give the business plan to her SBA representative when she returned from a scheduled vacation. (Counterclaim ¶ 42.)

Upon return from her vacation, McManus sent the plan to the Bank's underwriting department and, for the next two months, the Dumont parties provided the underwriting department with updated and additional information. (Counterclaim ¶¶ 43-44.) Duane Dumont urged McManus to arrange for the appraisal to prevent delay because there were other banks that could still provide the funding. (Counterclaim ¶ 45.) McManus knew that the Dumonts needed the fuel pumps converted to self-serve by at least the start of the tourist season in June 2009. (Counterclaim ¶ 47.) While waiting for the Bank's underwriting department to approve the loan, Duane Dumont told McManus if he could not get the funding, he would be shutting down around November 1, 2009 for lack of money. (Counterclaim ¶ 46.)

3

On June 5, 2009, the Bank issued a commitment letter to provide the $200,000 to D & F Properties in two loans. (Counterclaim ¶ 50.) The first loan was in the amount of $118,000 and secured through a second mortgage on the Monmouth property; the second was an SBA loan in the amount of $82,000 and secured by a fourth mortgage on the Monmouth property. (Counterclaim ¶ 50.) Both loans required the Dumonts and Pit Stop to serve as personal and corporate guarantors, respectively, and for CEI to subordinate its mortgage on the Monmouth property. (Counterclaim ¶¶ 50, 53.) The closing date was to be no later than July 31, 2009. (Counterclaim ¶ 50.)

The Dumont parties relied on McManus's professional expertise, superior position, and experience in obtaining the needed funding for the renovations, and relied on McManus's repeated promise of timely funding by the Bank. (Counterclaim ¶ 57.) Although McManus promised that the SBA loan would be approved in days, the SBA did not authorize the loan until July 28, 2009. (Counterclaim ¶¶ 54, 63.) The loans did not close on July 31, 2009, and the Bank amended the commitment letter, which provided that "time is of the essence," to set the closing date for August 31, 2009. (Counterclaim ¶¶ 59-60.) McManus told Duane Dumont that she would arrange for CEI to subordinate their loan, but she did not do so in a timely fashion and the loans did not close by August 31, 2009. (Counterclaim ¶¶ 65-67.) When the closing was scheduled for the end of September 2009, Duane Dumont asked McManus whether the loans were going through because he was prepared start spending operating capital on the renovations. (Counterclaim ¶¶ 69, 72.) McManus promised that the loans would go through, and in reliance on this promise, the Dumont parties spent thousands of dollars of their business operating capital to begin the renovations. (Counterclaim ¶ 71) McManus and the Bank knew that the Dumonts had begun the renovations. (Counterclaim ¶ 73.) On September 30, 2009, Duane Dumont

4

notified the Bank and McManus that they needed the funding immediately, and that it would be too late if it is further delayed. (Counterclaim ¶ 84.)

CEI never subordinated the loan and the Dumonts informed the Bank and McManus that they would be closing the Pit Stop on October 23, 2009, because they were out of capital and the Dumont parties' inability to convert the gas pumps caused them to lose $1000 per week. (Counterclaim ¶¶ 90-91.) Nevertheless, McManus and the Bank continued the loan process and discussed immediately loaning the Dumont parties $30,000. (Counterclaim ¶ 94.) In a subsequent meeting with Duane Dumont, McManus questioned whether Dumont was really closing his doors, and reviewed the balance sheets of the Pit Stop. (Counterclaim ¶ 97.) Because the Pit Stop was losing money, McManus said, "I don't know how I can give you a $30,000 loan." (Counterclaim ¶ 97.) The Bank then seized the Dumonts' bank accounts causing numerous checks to vendors to be returned due to insufficient funds. (Counterclaim ¶ 98.) The Dumonts closed their business and defaulted on their loans. (Counterclaim ¶ 99.) The Bank auctioned off the Monmouth property in January 2010 at or near half its value. (Counterclaim ¶ 100.)

When the Bank instituted foreclosure proceedings on the Monmouth property, the Dumont parties filed the following counterclaims against the Bank and third-party claims against McManus: 1) breach of oral contract (Count I); 2) breach of contract (Count II); 3) negligent misrepresentation (Count III); 4) fraudulent misrepresentation (Count IV); 5) breach of fiduciary duty (Count V); 6) breach of the duty of good faith and fair dealing (Count VI); 7) negligence (Count VIII); 8) intentional infliction of emotional distress (Count IX); and 9) negligent infliction of emotional distress (Count X).

## DISCUSSION

### I.    Standard of Review

A motion to dismiss pursuant to both M.R. Civ. P. 12(b)(6) and 12(c) "tests the legal sufficiency of the complaint and, on such a challenge, 'the material allegations of the complaint must be taken as admitted.'" *Shaw v. S. Aroostook Comm. Sch. Dist.*, 683 A.2d 502, 503 (Me. 1996) (quoting *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994)); *Camps Newfound/Owatonna Corp. v. Town of Harrison*, 1998 ME 20, ¶ 3, 705 A.2d 1109, 1111 (quoting *Shaw*, 683 A.2d at 503). When reviewing a motion to dismiss, this court examines "the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Shaw*, 683 A.2d at 503. A dismissal under M.R. Civ. P. 12(c) will be granted only "when it appears beyond a doubt that the plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim." *Id.* (quoting *Hall v. Bd. of Envtl. Prot.*, 498 A.2d 260, 266 (Me. 1985)).

### II.    Recovery in Tort, Recovery in Contract, and the Economic Loss Doctrine

Before addressing the individual counts of the counterclaim, the Court will first address the contentions of the Bank generally regarding recovery in tort and contract.[1] The Bank contends that this case is fundamentally a breach of contract action, and that the Dumont parties cannot simply recast their breach of contract actions as tort claims. In support, the Bank relies on the *Stull v. First American Title Insurance Co.*, 2000 ME 21, 745 A.2d 975, line of cases and the economic loss doctrine. As explained below, the Bank's arguments for dismissal on the more generalized grounds are unpersuasive.

First, at this stage in the proceedings, the Court does not consider nor address the merits of Defendants' tort and contract claims. Rather, as mentioned above, the issue is whether the

---

[1] The Bank and McManus filed a joint motion. For brevity, the Court only refers to the Bank.

6

complaint "sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Shaw*, 683 A.2d at 503. In addition, because the Defendants are four separate parties, their individual relationships with the Bank potentially differ. As a result, the remedies to which each Defendant might be entitled could vary. Finally, even if the Court were to apply the economic loss doctrine, which prohibits recovery for economic losses in the absence of personal injury or property damage,[2] in this case, the Court would not dismiss all of Defendants' tort claims as the doctrine does not apply applies to claims of misrepresentation. *See Cumis Ins. Soc'y v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 48 n.22 (Mass. 2009) (explaining that misrepresentation is an exception to the prohibition on recovering for purely economic losses in the absence of injury to person or property); *Excavation Techs, Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841-42 (explaining that negligent misrepresentation is an exception to the economic loss doctrine). Thus, to the extent that the Bank requests that the Court dismiss the counterclaim or enter judgment against the Defendant based on the Bank's general legal arguments, the Bank's arguments fail. The Court will, therefore, address each count of the counterclaim separately.

II.     Breach of Contract: Oral and Written (Counts I and II)

        A.      Breach of Written Contract (Count II)

Defendants allege that the Bank breached its written contract with the Dumont parties to loan them $200,000 by failing to fund the loan in a timely fashion, thereby breaching the "time is of the essence" provision. The contract in question is the June 5, 2009, commitment letter. The Bank argues that the breach of contract claim brought by Pit Stop and the Dumonts based on the

---

[2] The Law Court adopted and applied the doctrine in the context of a product liability action. *See Oceanside at Pine Point Condo. Owners Ass'n. v. Peachtree Doors, Inc.*, 659 A.2d 267, 270 (Me. 1995). Whether the Law Court would apply the doctrine to the negligence claim in this action is arguably an open question. *See Dunelawn Owners' Ass'n v. Gendreau*, 2000 ME 94, ¶ 10 n.11, 750 A.2d 591, 595 (declining to address whether the economic loss doctrine precluded recovery in tort).

7

commitment letter fails to state a claim that could entitle them to relief because they were not parties to the contract; only D & F Properties, not the other Dumont parties, was a party to the contract with the Bank. The Bank points to sections 1 and 17 of the letter, which, respectively, list D & F Properties as the sole borrower and prohibits third-party beneficiaries to the agreement. Those sections provide:

1.    BORRROWER:

    Borrower will be D & F Properties, LLC, a Maine Limited Liability Company.

. . . .

17.    NONASSIGNABILITY; NO THIRD PARTY BENEFICIARY

    This commitment is issued solely for the benefit of Borrower(s) and only for the purposes described herein. This Commitment may not be assigned without permission of Bank, and no other person(s) or party(ies) shall be a beneficiary hereof or have any rights hereunder, and no rights are conferred by this Commitment upon any other person(s) or party(ies), whether or not their name may be used or otherwise identified in this Commitment.

(Exh. 1 ¶¶ 1, 17.)

Based on this language, the Bank asserts that the only party that might have a cause of action is D & F Properties. In response, the Dumont parties assert that the contract, when viewed as a whole, is ambiguous on this point. The Court disagrees. The agreement is not ambiguous. The only parties to the written contract are D & F Properties and the Bank, and the contract expressly precludes third-party beneficiaries. Although the Dumont parties are closely related, the pleadings contain no basis upon which the Court would or could disregard the separate legal entity of D & F Properties to permit Pit Stop and the Dumont parties to proceed on their breach of contract claims.

8

With respect to D & F Properties' cause of action under the written contract, the Bank argues that dismissal is appropriate because 1) D & F Properties failed to plead the satisfaction of all conditions precedent as required by M.R. Civ. P. 9(c), and 2) the condition precedent of CEI's subordination of its loan did not occur and, therefore, the Bank had no obligation to consummate the loan transaction with D & F Properties.

Rule 9 relates to pleading special matters and provides in pertinent part:

**(c) Conditions Precedent.** In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity, but when so made the party pleading the performance or occurrence has the burden of establishing it.

M.R. Civ. P. 9(c). In paragraph 70 of their counterclaim, the Dumont parties state that the "Dumonts met all their requirements and/or those requirements in their control for issuance of the promised and contracted to renovation loans." Although Defendants did not specifically use the phrase "condition precedent," the Defendants have sufficiently alleged that the conditions precedent have been satisfied.

The Bank next argues that because the condition precedent to its performance, i.e., CEI agreeing to subordinate its loan, was in fact not satisfied, the Bank's performance was never due. (*See* Exh. 1 ¶ 13(J).) A condition precedent is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." BLACK'S LAW DICTIONARY 289 (7th ed. 1999). When assessing the non-occurrence of a condition, the Law Court has applied the Restatement (Second) of Contracts, which provides:

§ 225. Effects of the Non-Occurrence Of a Condition

(1) Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.

(2) Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.

(3) Non-occurrence of a condition is not a breach by a party *unless he is under a duty that the condition occur.*

Restatement (Second) of Contracts § 225 (1981) (emphasis added); *accord Coastal Ventures v. Alsham Plaza, LLC*, 2010 ME 63, ¶ 20, 1 A.3d 416, 422; *Diversified Foods, Inc. v. First Nat'l Bank*, 605 A.2d 609, 616 (Me. 1992). Here, because the Dumont parties allege that McManus assumed the responsibility of ensuring that CEI would subordinate its loan, (Counterclaim ¶¶ 65, 75), the fact that a condition precedent did not occur is not, at this stage of the proceedings, fatal to Defendants' claim.

## B. Breach of Oral Contract (Count I)

The Dumont parties' oral contract claim is based on allegations that McManus, on behalf of the Bank, verbally promised that the Bank would provide the Dumonts with $200,000 in funding in a timely manner and that CEI would subordinate its loan. (Counterclaim ¶¶ 106-07, 112.) Although the Bank makes several arguments in support of its request for dismissal, the Court need only address the Bank's contention that the counterclaim lacks definiteness.[5] For a contract to be enforceable, it must "'be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties.'" *Searles v. Trs. of St. Joseph's Coll.*, 1997 ME 128, ¶ 13, 695 A.2d 1206, 1211 (quoting *VanVoorhees v. Dodge*, 679 A.2d 1077, 1080 (Me. 1996)). In *Searles*, the coach of a college basketball team promised the parents of one of his players' that the school would pay his medical bills for an injured knee. *See*

---

[5] In addition, the Bank argues that: 1) the parol evidence rule bars consideration of any oral statements made prior to the execution of the 2009 contract; 2) the statute of frauds precludes enforcement of any oral contract because they involved an interest in land; and 3) oral promises after execution of the 2009 contract merely reiterate is terms and do not provide a separate basis for recovery.

*Searles*, 1997 ME 128, ¶¶ 12-13, 695 A.2d at 1211. The Law Court held that this promise was not an offer and there was no contract:

> In order to be legally operative and to create a power of acceptance, it is necessary that the offer shall contain all the terms of the contract to be made. It is not enough for one party to promise to do something. This party must also say what the other party must do in exchange.
>
> .... [A]n intention to do an act is not an offer to do it . . . a mere expression of intention or general willingness to do something. . . does not amount to an offer.

*Id.* ¶ 13, 695 A.2d at 1211-12 (quotation marks omitted).

In this case, the Defendants do not, in the counterclaim, allege the terms of the oral contract. In particular, Defendants have not alleged the Defendants' consideration for or obligations under the terms of the oral contract. In the absence of even an allegation of this material and essential term, Defendants cannot prevail on their claim for breach of an oral contract.

III.     Negligent Misrepresentation and Intentional Misrepresentation (Counts III and IV)

In a negligent misrepresentation action, a plaintiff must allege that (1) the defendant supplied false information to the plaintiff; (2) failed to exercise reasonable care or competence in obtaining or communicating this information; (3) the plaintiff justifiably relied on this information; (4) to the plaintiff's detriment. *Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (adopting section 552(1) of the RESTATEMENT (SECOND) OF TORTS). In a claim for fraud, or intentional misrepresentation, a plaintiff must assert that (1) the defendant made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing the plaintiff to act in reliance upon it; and (5) the plaintiff justifiably relied upon the representation as true and acted upon it to his or

11

her damage. *See Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640, 654 (citing *Me. Eye Care Assocs. P.A. v. Gorman*, 2008 ME 36, ¶ 12, 942 A.2d 707, 711).

In their counterclaim, Defendants identify the following statements as the bases for both their negligent and intentional misrepresentation claims: the repeated promises made by McManus, on behalf of the Bank, that the $200,000 was going to provided to Defendants in a timely fashion; McManus's statement that the SBA would approve the loan within days; and McManus's statement that she would arrange for CEI's subordination of the 2006 loan. (Counterclaim ¶¶ 125-33, 152-61.) Defendants assert the statements are false and that the Bank and McManus 1) failed to exercise reasonable care in communicating these statements to Defendants (on the negligent misrepresentation claim), and 2) knew they were false or acted with reckless disregard of their truth when communicating them to Defendants for the purpose of inducing Defendants' reliance (on the intentional misrepresentation claim). (Counterclaim ¶¶ 136-37, 163.) According to Defendants, in reliance on these statements, Defendants began renovations on the Pit Stop with their operating capital. (Counterclaim ¶ 71.) As this review of the counterclaim reveals, Defendants have set forth the elements necessary to sustain claims for negligent and intentional misrepresentation.

IV.    Breach of Fiduciary Duty (Count V)

Defendants assert that they "had a fiduciary relationship with McManus and they trusted and relied on her professional expertise, superior position and experience in obtaining the needed funding for the renovations" and "let down all their guard with [the Bank] and McManus [by] relying on McManus' repeated promises of timely funding by [the Bank] for the renovations." (Counterclaim ¶¶ 177-78.) Defendants also assert that there was a great disparity of position and influence between them and the Bank.

12

The Bank maintains that the Dumont parties have failed to set forth facts with sufficient particularity to enable the Court to determine that there was in fact a special or fiduciary relationship. A fiduciary relationship is "the actual placing of trust or confidence in fact by one party in another, and . . . a great disparity of position and influence between the parties at issue." *Bryan R. v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 1999 ME 144, ¶ 19, 738 A.2d 839, 846 (quoting *Morris v. Resolution Trust Corp.*, 622 A.2d 708, 712 (Me. 1993)). "An allegation of one party's inexperience or trust will not by itself warrant an adjudication of a confidential relation without a statement of the facts indicating the actual placing of confidence and trust, and the abuse of the relation." *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975).

As the Bank asserts, "[s]tanding alone, a credit-debtor relationship does not establish the existence of a confidential relationship" or a fiduciary relationship. *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 11, 762 A.2d 44, 47. The Dumont parties have, however, alleged more than the mere the existence of a creditor-debtor relationship. More specifically, they have alleged that Duane Dumont sought advice from McManus about the renovations to the Pit Stop; that despite the delays, the Dumonts trusted that the Bank and McManus would come through and secure the funds; and that after a certain period of time had elapsed without action, the Dumont parties continued to work with the Bank and McManus because of McManus's promises. These allegations, when viewed in the light most favorable to the Defendants, can be construed to allege a special relationship between the parties beyond simply one of creditor-debtor.

V.     Breach of the Duty of Good Faith and Fair Dealing (Count VI)

Defendants allege that "[the Bank] and McManus had a duty to act in care, with honesty, good faith and with fair dealing in the commercial transactions with [the] Dumonts and in the

13

performance or enforcement of all agreements and/or duties." (Counterclaim ¶ 188.) Defendants further allege that the Bank and McManus breached this duty "in the loan of funds for the renovations and the collection of loans and liquidation and/or sale of [the] Dumonts' assets, business and business property" and that the Dumonts suffered damages as a result. (Counterclaim ¶¶ 190, 192.)

Although Defendants do not in the counterclaim specify whether the duty arises under common law or the UCC, in their opposition to the Bank's motion, the Defendants focus on the UCC and the seizure by the Bank of the Dumont parties' bank accounts. *See* 11 M.R.S. § 1-203 (2009) ("Every contract or duty within this Title [the UCC] imposes an obligation of good faith in its performance or enforcement"). The Bank avers that it has the right of setoff between the deposit account and the indebtedness on the 2006 loan, and that the UCC permits the Bank to exercise the right of setoff. *See* 11 M.R.S. § 9-1402(2) ("Except as otherwise provided in subsection (3), the application of this Article to a security interest in a deposit account does not affect a right of recoupment or setoff of the secured party as to a deposit account maintained with the secured party.") The 2006 mortgage document grants the Bank the right of setoff should the Dumont parties default on the mortgage or loan. (Exh. 4 §§ 1.5(b), 3.) Even if the Bank had the right of setoff, because the Defendants allege a breach of the duty to act in good faith with respect to a statutory duty, Defendants have satisfied the requirements of notice pleading, and have asserted a claim for which recovery could be warranted.

VI.     Negligence (Count VIII) and Negligent Infliction of Emotional Distress (Count X)

The Dumont parties assert that the Bank and McManus owed a duty of care based on their banking and lending relationship that included "the timely seeking and obtaining of approval for the requested funding for renovations, in the funding and closing negotiations, in

14

contracting, timely and proper performance and enforcement of all agreements and/or duties."

(Counterclaim ¶ 201.) As discussed above, the Dumont parties also assert that they had a

fiduciary relationship with the Bank and McManus. (Counterclaim ¶¶ 176-86.) Other than the

duties imposed by a special or fiduciary relationship, there is no generalized duty of care based

solely on the lender-borrower relationship. *See Morris v. Resolution Trust Corp.*, 622 A.2d 708,

711-12 (affirming a jury verdict for breach of fiduciary duty between a bank and lender when the

evidence supported the finding of a special relationship); *cf. Camden Nat'l Bank V. Crest

Constr., Inc.*, 2008 ME 113, ¶ 11, 952 A.2d 213, 216 (noting that a "mortgagee-mortgagor

relationship does not, without more, create a duty of care between a bank and a customer"). That

is, for a bank and a borrower, any duty that arises is in the context of a specialized relationship,

which Defendants have alleged in connection with their breach of fiduciary duty claim. As

explained above, because the law does not recognize a separate duty, Defendants cannot prevail

on a negligence claim. In addition, because the breach of fiduciary duty claim allows the

Dumonts "to recover for emotional suffering, the claim for negligent infliction of emotional

distress is . . . subsumed in any award" that would be "entered on the separate tort" and should be

dismissed. *See Curtis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d 18, 26.

VII.    Intentional Infliction of Emotional Distress (Count IX)

In Maine, in order to prevail on an intentional infliction of emotional distress claim, a

plaintiff must prove that:

> (1) the defendant engaged in intentional or reckless conduct that inflicted serious
> emotional distress or would be substantially certain to result in serious emotional
> distress; (2) the defendant's conduct was so extreme and outrageous as to exceed
> all possible bounds of decency and must be regarded as atrocious and utterly
> intolerable; and (3) the plaintiff suffered serious emotional distress as a result of
> the defendant's conduct.

15

*Botka v. S.C. Noyes & Co.*, 2003 ME 128, ¶ 17, 834 A.2d 947, 952 (citing *Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22-23). Under this formulation, "[s]erious emotional distress means emotional distress, created by the circumstances of the event, that is so severe that no reasonable person could be expected to endure it." *Id.*

Defendants allege that: 1) the Bank and McManus intentionally or recklessly inflicted emotional distress on the Dumonts; 2) the Bank and McManus's "actions were so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious an utterly intolerable in a civilized community"; and 3) those actions caused the Dumonts "emotional distress, so severe that not reasonable person could be expected to endure it." (Counterclaim ¶¶ 206-08.) These assertions, when viewed in the light most favorable to the Defendants, are sufficient to survive a motion to dismiss.

VIII.   Punitive Damages (Count XII)

The Bank contends that the Court must dismiss the claim for punitive damages because they have failed to allege malice. Punitive damages may only be recovered upon the recovery of compensatory damages for tortious conduct. *See Jolovitz v. Alfa Romeo Distribs. of N. Am.*, 2000 ME 174, ¶ 11, 760 A.2d 625, 629. Although often plead as a separate count, a claim for punitive damages is more properly incorporated into each claim in the request for relief. Should Defendants ultimately prevail on their remaining tort claims, they could be entitled to recover for punitive damages upon proof of malice. *See Morgan v. Kooistra*, 2008 ME 26, ¶ 29, 941 A.2d 447, 455. Because malice can be implied from certain conduct, Defendants' failure to incorporate the specific term in the counterclaim does not preclude the possibility of a recovery for punitive damages. *Id.* ("Malice is proven by evidence that a party acted with ill will toward the plaintiff or that the conduct was so outrageous that malice can be implied . . . .").

16

## CONCLUSION

Based on the foregoing analysis, the Court orders:

1.  The Court grants the Motion to Dismiss as to Counts I, VIII, and X of the Counterclaim and Third-party Complaint.

2.  The Court grants the Motion to Dismiss Count II as to Defendants Duane Dumont, Frances Dumont, and Pit Stop, Inc. and denies the Motion to Dismiss Count II as to D & F Properties.

3.  The Court denies the Motion to Dismiss as to the remaining Counts of the Counterclaim and Third-party Complaint, provided that XII as a request for relief is incorporated into Defendants' substantive claims.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Order into the docket by reference.

Date: 10/3/11

_____
Justice, Maine Business & Consumer Court

17