STATE OF MAINE                                   BUSINESS & CONSUMER DOCKET
CUMBERLAND, ss.                                  DOCKET NO. BCDWB-CV-2017-26


KIMBERLY B. SCOTT, et al.,            )
                                      )
        Plaintiff,                    )
                                      )        ORDER DETERMINING WHICH
        v.                            )        CONDOMINIUM ASSOCIATION
                                      )        RULES AND REGULATIONS
FALL LINE CONDOMINIUM                 )        REQUIRE APPROVAL BY A
ASSOCIATION                           )        MAJORITY IN INTEREST OF UNIT
                                      )        OWNERS
        Defendant,                    )


The issue before the Court, on remand from the Law Court, is which Fall Line

Condominium Association rules and regulations require approval by a majority in interest of

Unit Owners under section 5.17 of the Association Bylaws.[1] On appeal from a declaratory

judgment issued by this court, the Law Court determined that section 5.17 unambiguously limits

the Board's broad authority under section 2.03(e) to adopt and amend rules. *Scott v. Fall Line

Condo. Ass'n,* 2019 ME 50, ¶ 10, 206 A.3d 307. According to section 5.17, the Board of

Directors must seek approval from a majority in interest of Unit Owners when promulgating or

amending rules of conduct that concern the use of the units, common areas, and facilities. *Scott v.

Fall Line Condo. Ass'n.,* 2019 ME 50, ¶ 13. The Law Court left to this Court the task of

determining "what constitutes a rule of conduct that dictates the use of the units, common areas,

or facilities." *Scott v. Fall Line Condo. Ass'n.,* 2019 ME 50, ¶ 13. As discussed below, the Court

---

[1] On remand, the parties agreed an evidentiary hearing was unnecessary, and submitted the issue to the Court on briefs.

1

concludes that most, but not all, of the Association's rules still in dispute are void because they constitute rules of conduct which require majority in interest approval pursuant to section 5.17.

## DISCUSSION

As the Law Court noted in its decision, condominium association's bylaws and declarations are contracts, *Scott v. Fall Line Condo. Ass'n.,* 2019 ME 50, ¶ 6, and thus must be "construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together [so] that it may be seen if and how one clause is explained, modified, limited or controlled by the others." *Scott v. Fall Line Condo. Ass'n.,* 2019 ME 50, ¶ 7, (quoting *Am. Prat. Ins. Co. v. Acadia Ins. Co.,* 2003 ME 6, ¶ 11, 814 A.2d 989 (quotation marks omitted). Generally, the court will not interpret a contract in a manner that would render meaningless any particular provision. *Farrington's Owners' Assn., v. Conway Lake Resorts, Inc.,* 2005 ME 93, ¶ 10, 878 A.2d 504. The language must be construed to give effect to the plain meaning of the words used. *Scott v. Fall Line Condo. Ass'n.,* 2019 ME 50, ¶ 8. (quoting *City of Augusta v. Quirion,* 436 A.2d 388, 392 (Me. 1981). In this case, what constitutes a rule of conduct concerning the use of the Units, Common Areas, and facilities, can be readily determined by the context and plain language of sections 2.03(e) and 5.17 of the Bylaws.

Section 2.03(e) authorizes the Board to adopt rules, without approval from a majority in interest of Unit Owners, "covering the details of the operation and use of the Property." The term "Property" is broadly defined in section 1.02 to encompass the land, buildings, improvements, easements, appurtenances, Units, Common Elements, and all other property, personal or mixed, comprising the Fall Line Condominium.[2] Section 2.03(e) is situated within section 2.03, which

2 Definitions for Unit and Common Elements are supplied in the Declaration and in the Maine Condominium Act, 33 M.R.S. § 1601-103.

enumerates the powers and duties of the Board. The Board's powers and duties generally include governance, maintenance of Common Areas, financial management, and administration. Section 2.03 is in turn embedded within Article 2, which is entitled Board of Directors. Article 2 describes the composition and function of the Board generally.

The Law Court determined that section 2.03(e)'s broad grant of authority to the Board to promulgate rules on its own is cabined by section 5.17. Section 5.17 requires the Board to obtain the approval of a majority in interest of Unit Owners in order to promulgate rules of conduct "concerning the use of the Units and the Common Areas and facilities."

In contrast to section 2.03(e), section 5.17 applies to only a subset of the Condominium's Property: Units, and Common Areas and facilities. Section 5.17 therefore has a narrower focus than does section 2.03(e), which addresses the Property as a whole. Section 5.17 also only applies to "rules of conduct." The phrase "conduct" is undefined, but susceptible to a plain language reading. "Conduct" is commonly defined to mean the manner in which a person behaves. *Conduct*, Dictionary.com, (last visited Oct. 2, 2019). "Rules of conduct" therefore mean rules of behavior. Further, read in the context of Article 5, the behavior at stake is that of Unit Owners and their guests (including renters). The term "use" is also undefined, but commonly understood to mean employ for some purpose. *Use,* Dictionary.com, (last visited Oct. 2. 2019). Based on its context and plain language, section 5.17 is unambiguous. Any rule concerning the manner in which Unit Owners and their guests use the Units and the Common Areas and facilities requires majority in interest approval of the Unit Owners in order to become valid and enforceable.

Considering the context and plain language of sections 2.03(e) and 5.17, along with the Law Court's admonishment that section 5.17 acts as a constraint on the Board's authority, it is

possible to derive a set of guidelines for determining when a rule is subject only to section 2.03(e), or constitutes a rule of conduct requiring majority of interest approval pursuant to section 5.17:

1. Subject to Guideline 4, below, Rules applying to the Property as a whole can be validly promulgated by the Board pursuant to section 2.03(e).

2. Subject to Guideline 4, below, Rules applying to Board responsibilities for governance, maintenance, financial management, or administration can be validly promulgated by the Board pursuant to section 2.03(e).

3. Rules concerning the manner in which Unit Owners and their guests use the Units and Common Areas and facilities need majority in interest approval pursuant to section 5.17 in order to be valid and enforceable.

4. Rules that have attributes that could be characterized as subject to only section 2.03(e), but which also concern the manner in which Unit Owners and their guests use the Units and the Common Areas and facilities, are subject to 5.17. In other words, in the case of conflict, dual or multiple purposes, section 5.17 prevails.

5. Rules that add to, provide specific examples for, or qualify provisions in the Bylaws that regulate the manner in which Unit Owners and their guests use the Units and the Common Areas and facilities, are subject to section 5.17. For instance, section 5.11(c) prohibits nuisances on the Property. If a rule is proposed that defines nuisances to include the use of percussion instruments and prohibits the use of such instruments in Units or the Common Areas, the rule is subject to section 5.17.

**APPLICATION TO RULES AT ISSUE**

The parties have agreed on the proper disposition of some rules reducing the rules in dispute.3 Applying the above guidelines to each of the remaining rules in dispute, the court finds as follows:

Rule 13:

Rule 13 provides the Board of Directors with unlimited discretion to prohibit any use of the condominium property it deems "incompatible with recreational living, or [. . .] objectionable to other persons." This rule allows the Board to set standards of behavior and restrict Unit Owner's use of units and common areas. Thus, Rule 13 is void for lack of majority in interest approval under § 5.17.

Rule 42:

Rule 42 limits the occupancy of units, restricting Unit Owners' use of their units. Thus, Rule 42 is void for lack of majority in interest approval under § 5.17

Rule 43:

Rule 43 prohibits the conversion of units into dormitory style living. This rule restricts the manner in which Unit Owners' use their Units. Thus, Rule 43 is void for lack of majority in interest approval under § 5.17.

Rule 45:

Rule 45 requires the Board of Directors permission to alter decks or limited common spaces adjacent to units. It restricts Unit Owners' use of Units and Common Areas and facilities. Thus, Rule 45 is void for lack of majority in interest approval under § 5.17.

Rule 46:

3 The parties have stipulated that, with the exception of Rule 13, Rules 1 through 41 were properly adopted pursuant to the Association's Bylaws and are valid. Additionally, Plaintiffs concede that Rules 62, 63, and 68 are governed by section 2.03(e) and are valid. Twenty-five rules remain for the Court's analysis: 13, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53,5 4, 55, 56, 57, 58, 59, 60, 61, 64, 65, 66, and 67.

Rule 46 also places restrictions on Unit Owners' ability to alter their Units, in this case preventing the conversion of two units into one without Board of Director approval. This rule concerns the manner in which Unit Owners use their Units. Thus, Rule 46 is void for lack of majority in interest approval under § 5.17.

Rule 47:

Rule 47 regulates the use of facilities and Common Areas by the general public and is thus only subject to Board approval under section 2.03(e). Thus, Rule 47 is valid.

Rule 48:

Rule 48 provides that external doors to the condominium building are locked during the off-season. Since the rule specifies that keys are provided to Unit Owners and their guests, however, the rule does not concern the manner in which Unit Owners and their guests use the Units and Common Areas and facilities. Rule 48 is only subject to Board approval under section 2.03(e). Thus, Rule 48 is valid.

Rule 49:

Rule 49 pertains to rental agents, and is substantially similar to Rule 33, which parties have stipulated is valid. Although Rule 49 contains some marginal differences from Rule 33 the differences do not push the rule into the ambit of section 5.17. Unit Owners can still rent their Units and their guests can obtain parking passes. The rule only adjusts the procedures by which these uses occur. Rule 49 is only subject to Board approval as part of Board administration. Thus, Rule 49 is valid.

Rule 50:

Rule 50 prevents short term rental units from bringing pets, while seasonal rentals are required to gain express written permission. This rule sets standards of behavior and restricts the

use of the Units by Unit Owners and their guests (including renters). Thus, Rule 50 is void for lack of majority in interest approval under § 5.17.

Rule 51:

Rule 51 prohibits smoking in Common Areas. This rule concerns use of the Common Areas by Unit Owners and their guests. Thus Rule 51 is void for lack of majority in interest approval under § 5.17.

Rule 52:

Rule 52 prohibits the use of the Main Common Room for certain activities and sets standards of behavior for those activities that are allowed. Thus, Rule 52 is void for lack of majority in interest approval under § 5.17.

Rule 53:

Rule 53 designates the small or TV Common Room primarily for use with board games and television. Thus, Rule 53 is void for lack of majority in interest approval under § 5.17.

Rule 54:

Rule 54 imposes certain use requirements on guests under the age of 18. Thus, Rule 54 is void for lack of majority in interest approval under § 5.17.

Rule 55:

Rule 55 restricts the items that can be brought into common rooms by Unit Owners and their guests. Thus, Rule 55 is void for lack of majority in interest approval under § 5.17

Rule 56:

Rule 56 prohibits Unit Owners and their guests from placing rugs, floor mats, shoes, boots, and ski equipment in the hallways. The hallways are Common Areas, and the rule

concerns the manner in which the Unit Owners and their guests use the Common Areas. Thus, Rule 56 is void for lack of majority in interest approval under § 5.17.

Rule 57:

Rule 57 prohibits ski boots from being worn in the building outside of designated areas. It restricts the manner in which Unit Owners and their guests use their Units and the Common Areas and facilities. Thus, Rule 57 is void for lack of majority in interest approval under § 5.17.

Rule 58:

Rule 58 regulates the hours of operation during which Unit Owners and their guests can use the Common Areas and facilities. Thus, Rule 58 is void for lack of majority in interest approval under § 5.17.

Rule 59:

Rule 59 governs the hours during which the Unit Owners and their guests can use the pool. The pool is a Common Area. Thus, Rule 59 is void for lack of majority in interest approval under § 5.17.

Rule 60:

Rule 60 regulates where Unit Owners and their guests can use and store different types of grills on and in their Units and Common Areas. Thus Rule 60 is void for lack of majority in interest approval under § 5.17.

Rule 61:

Rule 61 governs the manner in which Unit Owners and their guests can use Common Area parking lots. Thus, Rule 61 is void for lack of majority in interest approval under § 5.17.

Rule 64:

Rule 64 gives the Board and its agents the right to prevent any use of the Common Areas not expressly listed in the rules. Rule 64 concerns the use of the Common Areas by Unit Owners and their guests. Thus, Rule 64 is void for lack of majority in interest approval under § 5.17.

Rule 65:

Rue 65 pertains to the Board's duties and responsibilities for financial management and administration. Rule 65 does not regulate the manner in which Unit Owners and their guests can use their Units and Common Areas. Rule 65 is subject only to section 2.03(e). Thus, Rule 65 is valid.

Rule 66:

Rule 66 allows the Board and its agents to restrict the use of Common Areas by Unit Owners and their guests who engage in "unacceptable behavior." Rule 66 governs the manner in which Unit Owners and their guests use the Common Areas. Thus, Rule 66 is void for lack of majority in interest approval under § 5.17.

Rule 67:

Rule 67 merely restates the process by which rules and regulations are promulgated and amended. Rule 67 pertains to governance and administration, and as such is subject only to section 2.03(e). Thus, Rule 67 is valid.

## CONCLUSION

In conclusion, the Court determines that rules 13, 42, 43, 44, 45, 46, 50, 51, 52, 53, 54, 55, 56, 57,58, 59, 60, 61, 64, and 66 are invalid for a lack of approval from a majority in interest of Unit Owners, in accordance with section 5.17 of the Fall Line Condominium Association Bylaws. Rules 47, 48, 49, 65, and 67 are valid under section 2.03(e) of the Bylaws because the rules only need Board approval.

SO ORDERED.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: October 4, 2019                                     ___/s_____
                                                            Michael A. Duddy
                                                            Judge, Business and Consumer Court

**Kimberly B. Scott, et al. v. Fall Line Condominium Association**

**BCD-CV-17-29**

**Plaintiffs**

**Kimberly B. Scott, et al.**

                David Johnson Esq.
                Daniel Rosenthal, Esq.
                One Canal Plaza Suite 600
                Portland, ME 04101

**Defendants**

**Fall Line Condominium Association,**      Adam Taylor, Esq.
                                        30 Milk Street, 5th Floor
                                        Portland, ME 04101

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
DOCKET NO. BCD-CV-17-26 √

KIMBERLY B. SCOTT, *et al.*,        )
                                    )
    Plaintiffs/ Counterclaim-Defendants,  )
                                    )
    v.                              )        COMBINED ORDER ON CROSS-
                                    )        MOTIONS FOR SUMMARY
FALL LINE CONDOMINIUM               )        JUDGMENT
ASSOCIATION, *et al.*,              )
                                    )
    Defendants/ Counterclaim-Plaintiffs.  )

This matter comes before the Court on Plaintiffs/ Counterclaim-Defendants Kimberly Scott

and Thomas Scott's (collectively "the Scotts") motion for partial summary judgment and

Defendants/ Counterclaim Plaintiffs Fall Line Condominium Association (the "Association"),

Leonard Amburgey, and Neal Weinstein's (collectively "Defendants") motion for summary

judgment. Each party opposes the other's motion. Pursuant to the discretion granted it under M.R.

Civ. P. 7(b)(7), the Court rules on the motions without hearing.

## BACKGROUND

### I.  PROCEDURAL POSTURE

On February 28, 2017, Mr. Weinstein filed a statement of claim on behalf of the

Association naming the Scotts in a small claims action in Rumford District Court, No. RUMDC-

SC-2017-20 (the "small claims action"). (*Id.* ¶¶ 15-16.) On March 1, 2017, the Scotts filed a

complaint against the Association, Mr. Amburgey, and Mr. Weinstein in Rumford District Court.

(*Id.* ¶ 17.) On April 20, 2017, the District Court entered an order consolidating the two cases, and

this Court accepted transfer of the consolidated case on June 5, 2017. (*Id.* ¶ 19.)

The Scotts voluntarily dismissed several claims against the Association and all claims

against Mr. Amburgey personally; the Association, Mr. Amburgey, and Mr. Weinstein thereafter

1

made a request for an award of attorney fees as the prevailing parties on those claims. (*Id.* ¶¶ 21-22.) This Court dismissed the claims but denied, without prejudice, the request for an award of attorney fees. (*Id.* ¶ 23.) The Scotts subsequently filed their Amended Complaint on September 26, 2017, their operative pleading in this matter, reflecting the dismissed claims. (*Id.* ¶ 24.) The Association and Mr. Weinstein filed an Answer on October 10, 2017. (*Id.* ¶ 25.) The Association's, Mr. Amburgey's, and Mr. Weinstein's Counterclaim against the Scotts filed in response to the Scott's original complaint remains pending. (*Id.*)

## II.  FACTS

The Fall Line Condominiums are comprised of 128 condominium units adjacent to the Sunday River ski resort in Newry, Maine. (Joint S.M.F. ¶ 1.) The Fall Line Declaration of Condominium (the "Declaration") was adopted on November 19, 1985 and later recorded in the Oxford County Registry of Deeds in Book 1356, page 65. (*Id.* ¶ 2.) Fall Line is operated by the Association, of which all record owners of condominium units at Fall Line ("unit owners") are members pursuant to the Bylaws of the Association (the "Bylaws"). (*Id.* ¶ 3.)

Fall Line is governed by the Bylaws and the Declaration.[1] (*Id.* ¶¶ 6-7.) The Association has also promulgated "Rules and Regulations Applicable to All Unit Owners" ("rules and regulations"), first in November 1985 and most recently amended in December 2017. (*Id.* ¶¶ 8-10.) The Scotts contest only the most recent amendments to the rules and regulations in this lawsuit; however, pursuant to their legal theory, all of the rules and regulations would be void.

Mr. Amburgey owns a unit at Fall Line and is President of the Association and a member of the Board. (*Id.* ¶ 11.) Mr. Weinstein likewise owns a unit at Fall Line and is a member of the

---

[1] Both parties agree that Fall Line's Declaration and the Bylaws form a contract binding on each. *See Morison v. Wilson Lake Country Club*, 2005 ME 71, ¶ 20, 874 A.2d 885. (Joint Ex. B (the "Bylaws") § 1.03.) Accordingly, the Association has decided not to pursue Count III of its Counterclaim (unjust enrichment). (Pl.'s Mot. Summ. J. 26-27; Def.'s Opp'n to Pl.'s Mot. Summ. J. 20-21.) Summary judgment is thus granted in favor of the Scotts on this count.

2

Board. (*Id.* ¶ 12.) The Scotts are also Fall Line unit owners and therefore members of the Association. (*Id.* ¶¶ 13-14.)

At essence, the issues presented on these cross-motions for summary judgment can be boiled down to two principle disputes: whether the Scotts paid their Association dues in full and/or on time (the "payment dispute") and whether the Association has promulgated rules and regulations consistent with the Bylaws (the "rules and regulations dispute"). Claims relating to both disputes are reflected in both the Amended Complaint and the Counterclaim.

A. The Payment Dispute

The Association is authorized to assess and collect quarterly dues from unit owners. *See* 33 M.R.S. § 1603-115(b). (*See* Def's Supp'g S.M.F. ¶ 29.) The Scotts have been assessed dues thirty-five times since they purchased their unit in August 2008; they have been late in paying those dues twenty-two times. (*Id.*) As of December 2, 2016, the Scotts owed the Association $1,700.87. (*Id.* ¶ 33.) The Scotts dispute this balance only to the extent that it includes an 18% interest charge on a late payment; whether the Association is allowed to charge interest on late payments is an issue in this case. (Pl's Supp'g S.M.F. ¶¶ 20-24; Def's Opp'g S.M.F. ¶¶ 20-24.) On December 8, 2016, Ms. Scott reached out to Rebecca Record of The Tax Loft, the Association's vendor for invoicing and collections, to request a full accounting and explanation of the finance charges assessed against the Scotts due to their late payments, and Ms. Scott assured Ms. Record that she would "be sending a check for $1,650 tomorrow." (Def's Supp'g S.M.F. ¶¶ 31-32.) The Scotts indeed issued a check to the Association dated December 8, 2016 for $1,650 (the "December Check"); however, the check was not received until January 5, 2017 and included the notation "Accord & Satisfaction for all outstanding invoice as of 12/8/16." (*Id.* ¶¶ 35-37.)

The Association refused to cash the December Check because the amount owed exceeded

3

the amount reflected on the December Check and thus did not constitute accord and satisfaction of the amount owed. (*Id.* ¶ 38.) The Scotts admit that these may have been the Association's reasons for refusing to negotiate the December Check but deny that it was for less than what was actually owed. (*See* Pl's Opp'g S.M.F. ¶ 38.) Mr. Amburgey communicated the Association's refusal to accept the December Check to Ms. Scott via email on January 5, 2017 (the same day it was received); Ms. Scott responded the following day that another check "in full" would be forthcoming. (Def's Ex. R.) The Association thereafter received a second check from the Scotts in January 2017 (the "January Check"). (Def's Supp'g S.M.F. ¶ 39; Pl's Opp'g S.M.F. ¶ 39.) The January Check bore only Ms. Scott's name and was putatively signed by Ms. Scott, was undated, and included the notation "payment in full under protest." (Def's Supp'g S.M.F. ¶ 39; Pl's Opp'g S.M.F. ¶ 39.) The Association refused to cash this check as well because it was undated and included the notation "payment in full under protest;" the Association thus informed the Scotts that "neither check would be cashed" and that the matter had been "turned over for collection." (Def's Supp'g S.M.F. ¶ 42.)

On January 31, 2017, Mr. Weinstein sent a letter (the "collection letter") to the Scotts demanding $1,941.91, purportedly for the outstanding dues, additional accrued interest, and attorney fees. (Def's Supp'g S.M.F. ¶ 44, *see* Pl's Opp'g S.M.F ¶ 44.) Previously, based on the issue with the December Check and January Check, Mr. Amburgey had told the Scotts that they would be required to pay by money order, cashier's check, or credit card. (Def's Supp'g S.M.F. ¶ 43, *see* Pl's Opp'g S.M.F ¶ 43.) On February 1, 2017, the Scotts paid the Association $1,743.50 by credit card, which included $1,688.62 toward the amount owed to the Association and a credit card processing fee[2] of $54.88. (Def's Supp'g S.M.F. ¶ 45.) The credit card processing fee is

---

[2] Whether the Association is authorized to charge a 3.25% processing fee on credit card transactions is at issue in this case. (*See* Def's Supp'g S.M.F. ¶¶ 46-47.)

4

commensurate with the fee charged by credit card companies. (Def's Opp'g S.M.F. ¶ 18.) The Association considered this amount insufficient, and thereafter filed its statement of claim in the small claims matter in order to recover $538.29, which reflected the outstanding interest balance of $38.29 and $500 in attorney fees for Mr. Weinstein. (Def's Supp'g S.M.F. ¶ 48; Pl's Opp'g S.M.F. ¶ 48; Joint Ex. F.)

    B.  The Rules and Regulations Dispute

For at least twenty-five years, it has been the Association's practice that the Board establishes or amends the Association rules and regulations as it deems necessary and appropriate. (Pl's Supp'g S.M.F. ¶ 1; *see* Joint S.M.F. ¶ 11.) It has likewise been the practice of the Board to have Association members in attendance at the Association's annual meeting ratify the Board's actions over the prior year, including all rules and regulations that the Board adopted and implemented. (Def's Supp'g S.M.F. ¶¶ 9-10.) This vote is merely a matter of good corporate practice and is unnecessary to validate the actions of the Board. (*Id.*) The Scotts do not contest that these ratification votes take place; however, because they assert that the Board's practice of establishing or amending rules and regulations is in contradiction of the Bylaws, the Scotts take the position that the ratification vote cannot redeem those rules and regulations. (*See* Pl's Supp'g S.M.F. ¶ 11 ("*purportedly* ratify the actions of the Board for the last year")(emphasis added).)

This same protocol was followed by the Board with regard to what the Scotts label the "New Board Rules," a selective list of certain rules and regulations adopted by the Board in "recent years" that the Scotts object to because they see them as "consistent with the Board's my-way-or-the-highway attitude, and also draconian, unfair, and not properly implemented pursuant to the Association's [Bylaws]." (Pl's Supp'g S.M.F. ¶¶ 2, 5.) The Association denies that "New Board Rules" is an appropriate moniker, denies the accuracy of the Scotts' characterization of the so-

5

called New Board Rules, and denies that some of the New Board Rules are currently in force or were ever adopted as they are listed in the Scott's statement of material facts. (Def's Opp'g S.M.F. ¶¶ 2, 5.) However, the Association admits that it adopts and amends rules "from time to time" and does not deny that it has done so in "recent years." (Def's Opp'g S.M.F. ¶ 2.) As a result of "confusion" caused by the Scott's litigation, the Board (but not the unit owners) took the additional action of unanimously consenting to, confirming, ratifying, and adopting an updated and complete list of all extant rules and regulations, as compiled by Mr. Amburgey. (Def's Supp'g S.M.F. ¶¶ 11-15; Def's Ex. O.) Presumably this list includes at least some of the New Board Rules, although the accuracy of the Scotts' description of the New Board Rules in their statement of material facts is certainly disputed. (*See* Def's Opp'g S.M.F. ¶ 2.) The Scotts admit that this action took place but deny that it is relevant to their legal challenge to the New Board Rules. (Pl's Opp'g S.M.F. ¶¶ 11-15.) Instead, the Scotts point out that the New Board Rules were not approved by a majority in interest of the unit owners. (Pl's Supp'g S.M.F. ¶ 15.) The Association does not dispute that the Board has never sought or obtained the approval of a majority in interest of unit owners when adopting or amending rules and regulations. (Def's Opp'g S.M.F. ¶ 15; *see* Def's Supp'g S.M.F. ¶¶ 3, 6, 8-11.)

Beside this lawsuit, the Scotts have also challenged the Board's actions internally, by joining an *ad hoc* committee of unit owners who collectively share their concerns both about the Board's governance and the New Board Rules. (Pl's Supp'g S.M.F. ¶¶ 6-7.) The Association purports to deny or qualify these facts but the denial lacks a record citation and the qualification "admits that certain Unit Owners, including the Scotts," sent an email to the Board and unit owners communicating their concerns. *See* M.R. Civ. P. 56(h)(2). (Def's Opp'g S.M.F. ¶¶ 6-7.) Pursuant to this strategy, the Scotts and other unit owners have repeatedly requested access to the unit owner

6

email address list maintained by the Association. (Pl's Supp'g S.M.F. ¶¶ 40, 42; Def's Supp'g S.M.F. ¶ 17.) The Association admits that it maintains a list of email addresses for those unit owners who have provided the Association with their email addresses. (Def's Opp'g S.M.F. ¶ 28.) The Association also admits that it utilizes email to communicate with those unit owners. (Def's Opp'g S.M.F. ¶ 25.) The Association further admits that it has refused to provide the Scotts or any other unit owner access to its list of unit owner email addresses. (Def's Supp'g S.M.F. ¶ 17; Def's Opp'g S.M.F. ¶ 42.)

## STANDARD OF REVIEW

"Summary judgment is no longer an extreme remedy." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18. "Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.*" *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646 (quoting *Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir. 1996)). Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CityMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). A genuine issue exists where the jury would be required to "choose between competing versions of the truth." *MP Assocs. v. Liberty*, 2001 ME 22, ¶ 12, 771 A.2d 1040. To survive a defendant's motion for summary judgment, the plaintiff must establish a prima facie case for every element of the plaintiff's cause of action. *See Savell*, 2016 ME 139, ¶ 18, 147 A.3d 1179.

## ANALYSIS

I.  THE ASSOCIATION'S CLAIMS FOR BREACH OF CONTRACT AND VIOLATION OF STATUTE

7

## A. **The Association Fails to Meet its Burden as Movant**

The Association purports to move for summary judgment as to all counts brought in its Counterclaim against the Scotts. (Def's Mot. S.J. 1.) However, the Association does not address Count I (breach of Declaration and Bylaws) or Count II (violation of Maine Condominium Act) in its memorandum of law filed in support of its motion. (*See generally* Def's Mot. Summ. J.) The Scotts likewise move for summary judgment in their favor on "all counts of the . . . Counterclaim[]." (Pl's Mot. Summ. J. 1.) The Scotts address Counts I and II of the Counterclaim in their memorandum of law in support of their motion. (Pl's Mot. S.J. 18-26.) The Association counters the Scott's argument in its memorandum filed in opposition to the Scott's Motion. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 11-17.) However, the Association fails to establish a prima facie case for every element of its causes of action stated in Counts I and II. *See Savell*, 2016 ME 139, ¶ 18, 147 A.3d 1179.

The Court is thus in a difficult procedural position. The Scotts' motion for summary judgment identifies two legal issues that they argue are dispositive and that the undisputed facts require summary judgment be entered in their favor as to Counterclaim Counts I and II. The Association proposes alternative resolutions to the two legal issues, which would vitiate the Scott's defense as to the Association's claims in Count I and II, but the Association does not otherwise carry its burden as a counterclaim-plaintiff opposing a counterclaim-defendant's motion for summary judgment: to establish a prima facie case for every element of its causes of action stated in Counts I and II. *See Savell*, 2016 ME 139, ¶ 18, 147 A.3d 1179. *See also Me. Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 124 ("in order for [the plaintiff] to prevail on its contract claim, the jury must find: (1) breach of a material contract term; (2) causation; and (3) damages.").

8

Breach of contract is a straightforward cause of action, and the substance of the Association's claim is equally straightforward and the elements can be easily *inferred* from its Counterclaim and filings associated with these cross-motions: the Scotts were required to pay their dues on time under the Bylaws, and they did not. The Bylaws are in the summary judgment record, and the Counterclaim (Def's Countercl. ¶ 15) and one footnote addressed to an unrelated issue in the Association's motion (Def.'s Mot. Summ. J. 25 n.10) identify the material contract term the Association claims that the Scotts have breached (§ 5.02 of the Bylaws).[3] It can also be easily *inferred* that the Scotts' failure to pay caused the Association damages, however meager (the Association's statement of claim in small claims court was for $38.29, plus Mr. Weinstein's attorney fee of $500). However, the Court is prohibited from making inferences in favor of the moving party on a motion for summary judgment. *See Levis v. Konitzky*, 2016 ME 167, ¶ 20, 151 A.3d 20.

Summary judgment could thus be appropriately entered in favor of the Scotts on Count I and Count II of the Counterclaim based on the Association's failure to carry its burden on summary judgment. But because this Court has a strong preference for deciding cases on the merits, the Court addresses the two legal arguments raised by the Scotts in their motion for summary judgment on those two counts. *See Thomas v. Thompson*, 653 A.2d 417, 420 (Me. 1995).

**B. The Association Has Not Established an 18% Interest Rate on Past Due Assessments**

The Scotts argue that they cannot be in breach of contract or violation of the Maine Condominium Act based on their failure to pay 18% interest on an overdue assessment because

---

[3] The same is true for the purported statutory violation. 33 M.R.S. § 1603-115(b) provides that "common expenses shall be assessed against all the units" and 33 M.R.S. § 1603-116(a) grants the Association a statutory "lien on a unit for any assessment levied against that unit or fines imposed against its unit owner from the time the assessment or fine becomes due." The Association makes general references to the Maine Condominium Act in its argument.

the undisputed facts demonstrate that the Association has never established any interest charge for overdue assessments at any rate. (Pl.'s Mot. Summ. J. 18-20.) The Association counters that the uncontroverted evidence confirms that the Association has established and consistently applied an 18% interest charge on past due assessments. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 11-13.)

Both parties rely on the same statute, 33 M.R.S. § 1603-115(b). The relevant provision of the statute states that "[a]ny past due common expense assessment or installment thereof shall bear interest at the rate established by the association not exceeding 18% per year." The Scotts argue that because the Declaration, Bylaws, and rules and regulations all are silent as to charging interest on past due assessments, the Association has not "established" any interest rate to charge on past due assessments. (Pl.'s Mot. Summ. J. 18-19.) The Scotts point out that the only remedy for default in payment (or any other violations of the Condominium Act, the Declaration, the Bylaws, and the rules and regulations) is, if approved by a vote of the Board, that the violator be prohibited from the use and enjoyment of the common areas. (Pl.'s Mot. Summ. J. 19.) (Declaration, Art. XI.)

The Association acknowledges that there is no documentation of formal adoption of an 18% interest charge on past due assessments, but claims that section 1603-115(b) does not require that the interest rate be in any written form in order for the Association to "establish" the interest rate charged on past due assessments. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 12.) Instead, the Association draws the Court's attention to record evidence demonstrating that the Association has consistently assessed interest on past due balances at 18% for over 30 years (and prior to that, Sunday River charged the same rate when it managed the collection of quarterly dues from unit owners), invoices sent to unit owners state in the bottom left corner "Finance Charge of 18% per year on balances over 30 days," and that invoices dating back to at least 1998 reflect the 18% interest on past due assessments. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 11-12.) (Def's Ex. W.) The

10

Association also points out that section 1603-115(b) states that any past due common assessments "shall bear interest," and that this mandatory language contradicts the Scotts' argument that interest cannot be assessed until an interest rate is "established" by some affirmative act of the Association. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 13.) Neither party argues that the statute is ambiguous. The issue before the Court is thus the proper construction of the word "establish" as used in section 1603-115(b).

The term is not defined elsewhere in the Maine Condominium Act. Neither party cites to any law beyond the statute itself. Independent legal research suggests that neither a Maine court nor any other jurisdiction that has adopted the model act has had occasion to construe section 1603-115(b). *See* 33 M.R.S. § 1601-110 (Maine Condominium Act to be construed to make the law uniform among states enacting the uniform act). The dictionary definition of "establish" could support either construction. *See Establish*, MERRIAM-WEBSTER (May 14, 2018), https://www.merriam-webster.com/dictionary/establish ("1: to institute (something, such as law) permanently by enactment or agreement . . . 4a: to bring into existence: found . . . 4b: bring about, effect"). Neither party suggests that there is any dispute of material fact on which the definition would turn.

Although "establish" can mean simply "bring into existence," such a liberal construction sets dangerous precedent. The facts of this case present a close call, where for decades the Association's authority to charge interest on late assessments has gone largely challenged. But as the adage goes "bad facts make bad law." *Haig v. Agee*, 453 U.S. 280, 319 (1981) (*Brennan, J.*, dissenting). This case would be drawing a line where no line necessarily has to be drawn if condominium associations must "establish" an 18% interest charge on past due assessments through some formal, affirmative act consistent with their bylaws and declarations. This is also a

11

fairer outcome: In this case, all parties have been on notice of the 18% late fee. However, a purchaser of a new Fall Line unit would not necessarily be on notice of the interest charge, as the Declaration, Bylaws, and rules and regulations indisputably make no mention of interest charged on late assessments. Indeed, the Scotts themselves have apparently been disputing the fairness of this charge since it was first assessed against them. (Pl's Supp'g S.M.F. ¶ 51.)

With regards to the use of the word "shall" in section 1603-115(b), the Court reads this mandatory language as dependent on a condition: the establishment of an interest rate, not to exceed 18%. Once an interest rate is "established by the association," then past due assessments must bear interest at that rate. By its plain language, section 1603-115(b) cannot operate as a "gap filler" establishing a default interest rate. It requires a condominium association to affirmatively establish an interest rate in order for that rate to be charged on past due assessments.

This Court therefore rules that the Association has not "established" any interest rate to charge on past due assessments, and that the Scotts cannot be liable for breach of contract or violation of statute based on their failure to pay the $38.29 in interest charged against them.

## C. **The January Check Should Have Been Accepted by the Association**

The Scotts argue that they are entitled to summary judgment on Counts I and II because the January Check was wrongfully refused by the Association; had it been cashed, there would have been no breach of contract because their past due assessments would have been satisfied and there would be no violation of the Maine Condominium Act for the same reason. (Pl.'s Mot. Summ. J. 20-26.) The Association counters that it was within its rights to refuse the January Check and instigate a collection action against the Scotts because the January check was undated, included the notation "payment in full under protest" in the memo field, and Ms. Scott's signature was "forged" on the check by Mr. Scott. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 13-17.)

12

The Scotts claim that the January Check was a negotiable instrument and that the reasons the Association offers for refusing to cash it are unfounded. The Scotts point out that a check does not need to be dated to be negotiable. *See* 11 M.R.S. § 3-1113(2) ("If an instrument is undated, its date is the date of its issue or, in the case of an unissued instrument, the date it first comes into possession of a holder.") Here, the January Check was "issued" upon its "first delivery . . . for the purpose of giving rights on the instrument to any person." *Id.* § 3-1105(1). The Scotts further claim that the "under protest" language was also irrelevant to the January Check's validity. The Scotts claim that the language is not a restrictive endorsement but rather simply reserved for the Scotts the right to challenge the validity of the charge at some point. *C.f. id.* § 3-1106 (defining unconditional promise).

The Association concedes that the January Check was a negotiable instrument, and that the lack of a date did not render the check invalid. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 15.) However, the Association nonetheless argues that the January Check was otherwise deficient. The Association cites 11 M.R.S. § 3-1106(1)(a) for the proposition that a promise is unconditional unless it states an express condition on payment; however, it fails to explain what "express condition" is stated in the notation on the January Check. The Association next argues that because the check was "forged" by Mr. Scotts' own "admission" that the Association acted properly in refusing to cash it. However, the Association had already rejected the check before it learned that Ms. Scott had not signed the check herself. Furthermore, Mr. Scott was authorized to sign the check on behalf of Ms. Scott anyway. *See* 11 M.R.S. § 3-1402(1). This authorization removes Mr. Scott's act of signing on behalf of Ms. Scott from the criminal definition of forgery. *See* 17-A M.R.S. § 701(3). In sum, there was no legal impediment to the Association simply cashing the Scotts' check, which would have indisputably brought their past due balance current, thus

13

remedying their purported breach of contract and violation of the Maine Condominium Act.

In the absence of a legal justification for the Association's refusal to cash the Scotts' check, the Association finally argues that it "had every right not to accept the checks as written" because the Scotts are attorneys, they were failing to make payments, contesting the amounts due, and questioning the validity of certain actions and items as it related to the invoices and assessments due. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 15.) In other words, taken in context, the Association's failure to cash the January Check was reasonable based on the Scotts' purported misbehavior. This argument is not persuasive, particularly because the Scotts' questioning of the interest charged on late assessments was colorable and brought in good faith. *See* Part I.B. of this Order *supra.* Whether the Scotts, and Mr. Amburgey for that matter, could have been more gracious and forgiving in their dealings with each other is a question beyond the purview of this Court. But regardless, the fact remains that the Association demanded payment in a certain amount by a certain date, and the Scotts complied. In the absence of an actual legal impediment to cashing the Scotts' check, the Scotts' compliance with the Association's demand cannot form the basis of a determination that they were in breach of contract or violated the Maine Condominium Act.

The Association failed to carry its burden as movant on summary judgment and furthermore failed to effectively rebut the arguments raised by the Scotts in their motion. The Court therefore GRANTS summary judgment in favor of the Scotts on Count I and Count II of the Association's Counterclaim.

II.    THE ASSOCIATION IS ENTITLED TO SUMMARY JUDGMENT ON THE SCOTTS' CONSUMER CREDIT CODE CLAIM

The Scotts claim that the Association is prohibited from imposing a surcharge on credit card transactions by 9-A M.R.S. § 8-509(1). (Pl.'s Mot. Summ. J. 8-9; Pl.'s Opp'n to Def.'s Mot. Summ. J. 11-12.) The Association responds that the statute is inapplicable because only a "seller

14

in a sales transaction" is prohibited from imposing a surcharge. (Def.'s Mot. Summ. J. 20-21; Def.'s Opp'n to Pl.'s Mot. Summ. J. 19-20.)

Section 8-509 of Title 9-A of the Maine Revised Statutes provides:

> A seller in a sales transaction may not impose a surcharge on a cardholder who elects to use a credit card or debit card in lieu of payment by cash, check, or similar means. For purposes of this section, "surcharge" means any means of increasing the regular price to a cardholder that is not imposed on a customer paying by cash, check or similar means.

The Maine Consumer Credit Code defines "sale of services" as "furnishing or agreeing to furnish services and includes making arrangements to have services furnished by another." 9-A M.R.S. § 1-301(35). "Services" is in turn defined as "(a) work, labor, and other personal services, (b) privileges with respect to . . . entertainment, recreation, physical culture, . . . and the like[.]" *Id.* § 1-301(37). Neither of these definitions is cited by either party, who instead either rely on the natural language definition (the Scotts) or analogize to federal law (the Association).

The Association is not a seller in a sales transaction because the Scotts are not customers of the Association; they are members of the Association, which is a non-profit organization dedicated exclusively to managing Fall Line for the benefit of all unit owners, *i.e.* its members. 33 M.R.S. § 1603-101. The definition of sale of services under the statute is broad enough to sweep in the Association's charging of common assessment fees on unit owners, as the Association undoubtedly furnishes services as that term is defined in § 1-301(37). However, section 8-509 goes on to define "surcharge" as "any means of increasing the regular price . . . that is not imposed on a *customer* paying by cash, check or similar means." (Emphasis added.) "Customer" is not defined in 9-A M.R.S. § 1-301 and appears infrequently in Title 9-A of the Maine Revised Statutes. *But see* 9-A M.R.S. § 4-403 (definition of "customer" in securities transactions). Nonetheless, it would

15

be absurd or illogical—and unfair—to rule that the non-profit Association's "members" (all Fall Line unit owners) are its "customers," and that a cost which benefits only one member of the Association must be borne by all members. *Manirakiza v. HHS*, 2018 ME 10, ¶ 14, 177 A.3d 1264 (courts required "to construe statutes to avoid an illogical or absurd result").

Furthermore, failing to charge the Scotts or any other unit owner who pays her assessment by credit card would violate 33 M.R.S. § 1603-115(c)(2), which provides that a "common expense benefitting fewer than all of the units shall be assessed exclusively against the units benefitted." To the extent that 33 M.R.S. § 1603-115(c)(2) would conflict with the Scotts' construction of 9-A M.R.S. § 8-509, the better practice is to adopt a construction that harmonizes the two statutes. *Yeadon Fabric Domes, Inc. v. Me. Sports Complex, LLC*, 2006 ME 85, ¶ 20, 901 A.2d 200 ("When two statutes appear to be inconsistent, [the court] should harmonize them if at all possible.") (citation omitted). The Association's construction of 9-A M.R.S. § 8-509 effects such harmony.

Based on the foregoing, the Court GRANTS summary judgment in favor of the Association on Count I of the Amended Complaint, and DENIES the Scotts' motion for summary judgment as to this count.

### III. THE ASSOCIATION IS ENTITLED TO SUMMARY JUDGMENT ON THE SCOTT'S FAIR DEBT PRACTICES ACT CLAIM

Only the Defendants move for summary judgment on Count II of the Scotts' Complaint, which states a cause of action against Mr. Weinstein and the Association for violating the federal Fair Debt Practices Act, 15 U.S.C. §§ 1692-1692p. The Scotts respond that disputed issues of material fact preclude a grant of summary judgment to the Defendants on this claim. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 8-11.)

The Scotts' claim is based on the collection letter that Mr. Weinstein sent the Scotts after the Association elected not to cash the January Check. (Joint Ex. E.) This letter demands payment

16

in the amount of $1,941.91, which includes Mr. Weinstein's $200 initial fee. (*Id.*) The letter references the December Check and the January Check, and requires payment by money order, cashier's check, or credit card because the December Check "was made out in the wrong amount and with conditions" and the January Check "was intentionally left undated." (*Id.*) The letter concludes: "NOTICE [. . . .] This is an attempt to collect a debt and any information and all information obtained will be used for that purpose." (*Id.*) The letter does not include the required notices that a debt collector must include in her initial communication with a consumer or within five days of the initial communication, as described in 15 U.S.C. § 1692g(a).

The Defendants admit that Mr. Weinstein never communicated these notices to the Scotts, but move for summary judgment on the ground that Mr. Weinstein is not a debt collector as that role is defined under the FDPA. *See id.*, § 1692a(6)(A) ("The term [debt collector] does not include . . . any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor"). The Defendants argue that because Mr. Weinstein was acting in his capacity as a member of the Board he satisfies this exception to the definition of a debt collector. (Def.'s Mot. Summ. J. 18.) In support of this argument, the Defendants point out that Mr. Weinstein has been a member of the Board since 2011. (Def's Supp'g S.M.F. ¶ 23.) The Defendants further claim that Mr. Weinstein is not a collection attorney as part of his private practice; this claim is objected to and disputed by the Scotts. (Def's Supp'g S.M.F. ¶ 27; Pl's Opp'g S.M.F. ¶ 27.)

For their part, the Scotts respond that Mr. Weinstein was operating in his capacity as an attorney at the Law Office of Neal L. Weinstein, and not as a Board member, when he sent them the letter. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 9.) In support of their argument, the Scotts point out that Mr. Amburgey told Ms. Scott that "Neil's [*sic*] firm has taken care of collections for some time now." (Pl's Supp'g S.M.F. ¶ 44; Pl's Ex. 17.) The Scotts further adduce that the letter was on

Mr. Weinstein's law office letterhead, not Fall Line letterhead. (Joint Ex. E.) Finally, the Scotts indicate that the letter makes clear that Mr. Weinstein expected to be compensated for his services, as the letter demands $200 toward his initial fee. (*Id.*) The Scotts claim that Mr. Weinstein could not have made this demand if he was acting in his capacity as a Board member; however, section 2.14 of the Bylaws only prohibits a member of the Board from "receiving any compensation *from the Condominium Association* for acting as such" (emphasis added). (*See* Joint Ex. B.)

The undisputed facts demonstrate that Mr. Weinstein was not acting in his capacity as a member of the Board, but as a private attorney retained by the Board for the purpose of collecting the Scotts' purportedly past due assessments. The Defendants' argument is essentially that because Mr. Weinstein is a member of the Board *ergo* he was acting in his capacity as a Board member. The determination is not that simple. *Cf. Holland v. Sebunya*, 2000 ME 160, 759 A.2d 205 ("[plaintiff] must demonstrate more than [defendant's] status as a state official" to show that there is no dispute of material fact that defendant was acting in that capacity to prevail in civil rights suit).

However, it is also reasonably clear that Mr. Weinstein would not have undertaken his representation of the Association to collect the purported debt but for his relationship with the Association—specifically, as a member of the Board. Both parties cite to *Beacon Hill Townhomes Condo. Ass'n v. Ullrich*, 2013 Del. C.P. LEXIS 37, (Oct. 18, 2013), an unpublished trial court decision from the Delaware Court of Common Pleas, which ruled that an association's attorney is not a debt collector when she is solely acting on behalf of her client (the original creditor) for the purpose of collecting past due assessments. *Id.* * 7-8. This principle is reflected in 15 U.S.C. § 1692a(6)(B), which while not controlling, is helpful in construing the statute. *See Doane v. HHS*, 2017 ME 193, ¶ 13, 170 A.3d 269 ("To determine [legislative] intent, [courts] first look to the

18

statute's plain meaning and the entire statutory scheme of which the provision at issue forms a part.") (quotation omitted). It is undisputed that Mr. Weinstein has only done legal work for the Association since becoming a member of the Board. (Def's Supp'g S.M.F. ¶ 24.) Although the Scotts dispute whether Mr. Weinstein is a "collection attorney" and claim that such a determination is a "legal conclusion," the denial of this fact lacks does not generate a material factual dispute. (Pl's Opp'g S.M.F. ¶ 27.) The citation supporting the denial is to paragraphs 45-46 of the Scotts' supporting statement of material facts, and those paragraphs establish only that Mr. Weinstein has "taken care of" or "tak[en] on" collections on behalf of the Association. (Pl's Supp'g S.M.F. ¶¶ 45-46.) Although the characterization of Mr. Weinstein as a "collection attorney" is disputed, there is nonetheless no genuine dispute that "the principal business" of Mr. Weinstein "is not the collection of debts." *See* 15 U.S.C. § 1692a(6)(B).

In sum, although Mr. Weinstein wrote the collections letter to the Scotts in his personal capacity rather than as a member of the Board, the Defendants nonetheless prevail on summary judgment on Count II of the Complaint because Mr. Weinstein is not a "debt collector" as that term is defined in 15 U.S.C. § 1692a(6). The Court therefore GRANTS summary judgment in favor of the Defendants on Count II of the Amended Complaint.

I.    THE BYLAWS REQUIRE THE BOARD TO OBTAIN THE APPROVAL OF A MAJORITY IN INTEREST OF THE UNIT OWNERS TO ADOPT AND AMEND RULES AND REGULATIONS

In Count III of their Complaint, the Scotts seek a declaratory judgment voiding "unlawful rules and regulations" on the grounds that the Board has not adopted and amended rules and regulations in the manner prescribed by the Bylaws. (Pl's Compl. ¶¶ 47-50.) In Count IV of its Counterclaim, the Association seeks a declaratory judgment that the rules and regulations "are valid and enforceable" under the Declaration and Bylaws. (Def's Countercl. ¶¶ 47-49.) Although

19

the Scotts seek a declaratory judgment voiding only the New Board Rules, the methodology used by the Board for the adoption and amendment of rules and regulations has been the same since Mr. Amburgey became Association president over twenty years ago. (Def's Supp'g S.M.F. ¶¶ 7-8.) An initial set of rules and regulations was one of the original governing documents of the Association. (Joint Ex. C.) This Court is authorized to declare the respective rights, status, and other legal relations between these parties as it relates to the rules and regulations by the Maine Declaratory Judgment Act, 14 M.R.S. §§ 5951-5963.

The Board has purported to adopt and amend new rules and regulations without attempting to secure the approval of a majority in interest of the unit owners. (Pl's Supp'g S.M.F. ¶ 15; Def's Opp'g S.M.F. ¶ 15; Def's Supp'g S.M.F. ¶¶ 3, 6, 8-11.) The Scotts point out that under § 5.17 of the Bylaws, titled "Rules of Conduct," "[r]ules and regulations concerning the use of the Units and the Common Areas and facilities may be promulgated and amended by the Board of Directors *with the approval of a majority in interest of the Unit Owners.*" (Joint Ex. B (emphasis added).) The Scotts argue that this language clearly and unambiguously requires the Board to obtain the approval of a majority in interest of the unit owners by vote in order to adopt or amend rules and regulations. (Pl.'s Mot. Summ. J. 11-14; Pl.'s Opp'n to Def.'s Mot. Summ. J. 2-5.) The Association responds that § 5.17 clearly and unambiguously provides that the Board "may" obtain the approval of a majority in interest of the unit owners to adopt or amend rules and regulations, but is not required to obtain this approval. (Def.'s Opp'n to Pl.'s Mot. Summ. J. 7, 10.) Confusingly, in its own motion for summary judgment, the Association suggests that this language is ambiguous, but that because the rules and regulations adopted by the Board (including the New Board Rules) are reasonable they are protected by the business judgment rule.[4] (Def.'s Mot. Summ. J. 14-16.)

---

[4] The Association's primary argument in opposition to the Scotts' motion is that the question of the validity of the rules and regulations "has been rendered moot as a result of the Association Board's actions by unanimous consent"

20

Section 5.17 clearly and unambiguously requires the Board to obtain the approval of a majority in interest of unit owners in order to adopt or amend rules and regulations. The use of the word "may" obviously indicates that the Board is allowed, but not required, to adopt rules and regulations regarding conduct if it so desires. *See* 33 M.R.S. § 1603-106(a) (bylaws not required to provide for the adoption or amendment of rules and regulations); *id.* § 1603-102(a)(1) (condominium association "may [a]dopt and amend. . . rules and regulations"); *see also* Declaration, § 4.4(d) ("rules and regulations regarding [use of common areas] . . . *may* be established and amended from time to time by the Board [.]") (Joint Ex. A (emphasis added).) Reading the word "may" to instead indicate that the approval of a majority in interest of the unit owners is optional for the Board is to effectively render that provision meaningless. The Court must construe a contract in such a way as to give meaning to all language. *See Top of the Track Assocs. v. Lewiston Raceways*, 654 A.2d 1293, 1296 (Me. 1995). The Association—not for any devious reason, but merely out of administrative convenience—would never exercise the option, as indeed the undisputed facts show the Association has never done for Fall Line.

The Association attempts to obscure the relative clarity of § 5.17 by pointing out various provisions of the Declaration and Bylaws which grant sweeping powers to the Association. *See* Declaration, §§ 4.4(d), 9.2(a), 11 (Joint Ex. A); Bylaws §§ 1.03, 2.03(e), 2.12, (Joint Ex. B). *But see* Bylaws, § 2.03 (authority of Board limited as provided in the Bylaws). Fall Line's governing documents grant the Association considerable authority to govern and manage Fall Line, but these general grants of authority must give way to the specific requirements of section 5.17 of the Bylaws

whereby the Board unanimously voted to "confirm, ratify, and adopt the existing rules and regulations." (Def.'s Mot. Summ. J. 12-13 (emphasis in original).) This argument is entirely without merit. If the Bylaws indeed require the approval of the majority in interest of unit owners in order to adopt or amend rules and regulations, then the Board acting alone cannot circumvent that requirement, no matter what language the Board chooses to use in its resolutions or whether the resolution is unanimously adopted by Board members.

21

to the extent they are in conflict,[5] as in the case of Declaration § 4.4(d). *Cf. Koch Refining Co. v. State Tax Assessor*, 1999 ME 35, ¶ 6, 724 A.2d 1251 (in statutory construction, the specific must prevail over the general).

In sum, the Court GRANTS summary judgment in favor of the Scotts and DENIES the Association's motion as to Count III of the Amended Complaint and Count IV of the Counterclaim. This leaves open the question of what relief the Court should grant on these cross-motions for declaratory judgment as to these counts.

The Scotts' proposed order merely includes language granting the motion and entering judgment in their favor on all counts (with the exception of Count II of the Amended Complaint). The Scotts' memorandum of law asks the Court to declare null and void only the "New Board Rules," which as the Association points out are not well-defined. However, in the Amended Complaint, the Scotts seek a declaration "that *all* [rules and regulations] affecting Unit Owners and their use of their units and of any common element not approved by a majority in interest by the Unit Owners were not lawfully adopted" and therefore void. (Pl's Compl. ¶ 50 (emphasis added).) Based on this Court's ruling and the undisputed facts, none of the extant rules and regulations were properly adopted under the Bylaws. The Court therefore declares that all rules and regulations putatively established by the Association are void, pending a vote to garner the approval of a majority in interest of the unit owners at Fall Line.

IV.     THE ASSOCIATION IS REQUIRED TO MAKE THE LIST OF EMAIL ADDRESSES IT USES TO COMMUNICATE WITH UNIT OWNERS AVAILABLE TO THE SCOTTS AND ALLOW THEM TO MAKE COPIES

---

[5] 33 M.R.S. § 1602-103(c) provides that "[i]n the event of a conflict between the provisions of the declaration and the bylaws, the declaration prevails . . . ." This statute is not cited by the Association, and in any event, the Declaration is not "in conflict with" the Bylaws. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 6.) As the Scotts point out, there is no question that the Association is authorized to adopt and amend rules and regulations. (*Id.* 7-8.) The question is the procedure that must be followed to do so: a question that is answered by § 5.17 of the Bylaws.

The Association uses email to communicate with unit owners, and maintains a list of unit owner email addresses for that purpose. (Def's Opp'g S.M.F. ¶¶ 25, 28.) The Scotts argue that, pursuant to 33 M.R.S. § 1603-118, the Association is required to make that list available to the Scotts or any other unit owner for copying. (Pl.'s Mot. Summ. J. 24-28; Pl.'s Opp'n to Def.'s Mot. Summ. J. 13-16.) The Association counters that 33 M.R.S. § 1603-118(a)(3) only requires the Association to share the mailing addresses of unit owners with the Scotts, and that because unit owners' email addresses are confidential, the Association is prohibited from sharing the email addresses with anyone. (Def.'s Mot. Summ. J. 21-23; Def.'s Opp'n to Pl.'s Mot. Summ. J. 17-19.) This Court is authorized to declare the respective rights, status, and other legal relations between these parties as it relates to the rules and regulations by the Maine Declaratory Judgment Act, 14 M.R.S. §§ 5951-5963.

Section 1603-118(a)(3) of Title 33 of the Maine Revised Statutes provides that a condominium association:

> [M]ust retain . . . . The names of current unit owners in a form that permits preparation of a list of the names of all unit owners and the addresses at which the association communicates with them, in alphabetical order showing the number of votes each unit owner is entitled to cast[.]

Section 1603-118(b) provides that, subject to certain exceptions, "all records retained by an association must be available for examination and copying by a unit owner or the unit owner's authorized agent[.]" "Records retained by an association [that] may be withheld from inspection" include *inter alia* records that concern "[e]xisting or potential litigation[,]" "[e]xisting or potential matters involving . . . formal proceedings before a government tribunal for enforcement of the declaration, bylaws or rules[,]" and "[i]ndividual unit files other than those of the requesting unit owner." 33 M.R.S. § 1603-118(c)(3)-(4),(8).

23

The Scotts argue that because it is undisputed that the Association retains a list of unit owner email addresses, section 1603-118(b) mandates that the Association allow the Scotts to examine and copy that record. (Pl.'s Mot. Summ. J. 16-17.) Section 1603-118(a)(3) is used to buttress this argument to the extent that it requires a condominium association to retain a list "of the names of all unit owners and the addresses at which it communicates with them[.]" (*Id.* 14-15.) The Association counters that section 1603-118(a)(3) is irrelevant because it covers only mailing addresses, not email addresses. (Def.'s Mot. Summ. J. 21.) While the Association does not dispute that it retains a list of unit owner email addresses, it argues that it is allowed to withhold that record on the grounds that it concerns existing litigation, formal proceedings for enforcement of the Declaration, Bylaws, and rules and regulations,[6] and individual unit files. (Def.'s Mot. Summ. J. 22-23; Def.'s Opp'n to Pl.'s Mot. Summ. J. 17-18.)

There is a paucity of authority construing this provision of the model act, although an intermediate appellate court in Kansas (which has adopted the model act) held in an unpublished opinion that the names and addresses of other unit owners who were delinquent in their dues payments cannot be withheld from another unit owner under the "individual unit files" exception. *See Frobish v. Cedar Lakes Vill. Condo. Ass'n*, 2015 Kan. App. Unpub. LEXIS 519, *9-10, 353 P.3d 469. Although section 1603-118(a)(3) does not control the outcome here, it is helpful in determining the legislative purpose of the "individual unit files" exception. *See Doane*, 2017 ME 193, ¶ 13, 170 A.3d 269.

The Association's claim that unit owner email addresses—which are indisputably used by the Association to communicate with unit owners—may be withheld from the Scotts as "individual

---

[6] This argument is not sufficiently developed to warrant discussion. It is undisputed that the Scotts are not the only unit owners who have requested a list of email addresses from the Association. (Def's Supp'g S.M.F. ¶ 17.) How the email addresses themselves satisfy either of these two exceptions is unexplained by the Association.

unit files" begs the question of which records are not individual unit files. The Association takes the position that it is any information unique to a particular unit or unit owner. However, this position is undermined by § 1603-118(a)(3), which includes unit owner addresses in the list of records a condominium association must retain and make available for examination and copying by unit owners. This suggests that the Legislature did not intend such a sweeping definition of "individual unit files." It further suggests that the Legislature intended unit owners to be able to obtain, through the Association, a method of communication with other unit owners about mutual concerns.

By reason of the foregoing, the Court GRANTS summary judgment in favor of the Scotts on Count IV of their Amended Complaint, and DENIES the Association's motion for summary judgment as to that count. The Court declines to declare that the term "addresses" as used in 33 M.R.S. § 1603-118(a) necessarily includes "email addresses," but declares that the email addresses of unit owners are nonetheless records subject to review and copying pursuant to 33 M.R.S. § 1603-118(b). (*See* Pl's Compl. ¶ 60.)

V.     THE ASSOCIATION IS NOT ENTILED TO AN AWARD OF ATTORNEY FEES; THE DEFENDANTS FAIL TO ADDRESS THE INDEMNIFICATION COUNTS IN THEIR MOTION OR IN OPPOSITION TO THE SCOTTS' MOTION

A. **Attorney Fees**

The Scotts concede that the Bylaws and the Maine Condominium Act provide a basis for the Association to recover attorney fees and costs. (Pl.'s Mot. Summ. J. 30-31; Pl.'s Opp'n to Def.'s Mot. Summ. J. 17.) However, the Scotts argue that an award of attorney fees is only authorized in limited circumstances and is conditional on the Association's prevailing on the merits. (*Id.*)

Section 5.07(b) of the Bylaws provides that the violation of any rule or regulation or breach of the Bylaws "shall give the Board of Directors the right . . . [t]o enjoin, abate or remedy by

25

appropriate legal proceedings . . . the continuance of any such breach at the cost, including attorney's fees, of such Unit Owner[.]" Although the Association cites to other provisions of the Bylaws and Declaration—including the nonexistent §5.02(g)—none of these other provisions directly address the issue of attorney fees, and thus those provisions cannot form a contractual basis for an award of attorney fees to the Association.

Section 1603-116 of Title 33 of the Maine Revised Statutes addresses a condominium association's ability to foreclose on liens for past due assessments.[7] 33 M.R.S. § 1603-116(g) provides that a "judgment or decree under this section shall include costs and reasonable attorney's fees for the prevailing party." Our Law Court has held that any suit to collect or validate a past due assessment falls within the scope of 33 M.R.S. § 1603-116. *Stage Neck Owners Ass'n v. Poboisk*, 1999 ME 52, ¶¶ 7-10, 726 A.2d 1261. *See also Ocean Meadows Condo. Ass'n v. Nordberg*, Mem-09-115 (June 4, 2009).

The Association effectively concedes that an award of attorney fees is conditional on their prevailing on the merits of their claim, particularly Count I, as this is the claim that alleges the Scotts are in breach of contract for failing to timely pay assessments. Because the Association does not prevail on that count, this ends the analysis. The Association has failed to establish a statutory or contractual basis for fees to be assessed against the Scotts, and the Court therefore declines to award the Association its costs and attorney fees. Each side will pay its own costs and fees incurred in this litigation.

B. **Indemnification of Messrs. Weinstein and Amburgey**

---

[7] The Association fails to cite to 33 M.R.S. § 1603-115(e) as an alternative statutory ground for the award of attorney fees, which provides that if "any common expense is caused by the misconduct of any unit owner, the association may asses that expense exclusively against his unit." The Scotts, who anticipated this as a potential ground for an award of attorney fees address the statute's inapplicability in their own motion for summary judgment. (Pl.'s Mot. Summ. J. 28-29.) Because it is not raised by the Association, the Court declines to consider it.

26

Although the Defendants purport to move for summary judgment as to all counts of their Counterclaim, the memorandum of law filed in support of their motion does not address Counterclaim Counts V and VI, which seek indemnification for Mr. Amburgey and Mr. Weinstein, respectively. The Defendants also decline to address these counts in their opposition to the Scotts' motion for summary judgment, despite the Scotts arguing for summary judgment in their favor in their own memorandum of law seeking summary judgment as to those counts. (Pl.'s Mot. Summ. J. 29-33.) The Court therefore treats the Scotts as movants, and the Defendants as nonmovants, for purposes of the indemnification counts and attributes their respective burdens accordingly.

The Scotts' burden as movants on summary judgment is to show that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law as to those counts. M.R. Civ. P. 56(c). The Defendants' burden as counterclaim-plaintiffs defending against a motion for summary judgment is to establish a prima facie case for every element of the plaintiff's cause of action. *See Savell*, 2016 ME 139, ¶ 18, 147 A.3d 1179. If appropriate, the Court may grant summary judgment in favor of the Defendants as nonmovants, despite their failure to address these counts in their motion. M.R. Civ. P. 56(c).

The Scotts have met their burden. The Scotts' motion explains why the indemnification provisions of section 2.15 of the Bylaws (*see* Def's Countercl. ¶¶ 52, 57) is inapplicable in this case, where the claim brought against Mr. Amburgey in the first instance (prior to its dismissal) sounded in bad faith and they sued Mr. Weinstein in his capacity as the Association's attorney, not as a member of the Board. (Pl.'s Mot. Summ. J. 31-32.) Next, the Scotts show how the section 2.15 indemnification requirements operate only as to suits by third parties against Board members individually, and that the burden of indemnification falls on all unit owners proportional to their

27

interest in Fall Line. (*Id.* 33.) As noted above, the Defendants offer nothing in rebuttal, and thus do not meet their burden of establishing a prima facie case for their indemnification claims.

In sum, the Scotts have succeeded in demonstrating to the Court that there is no genuine issue of material fact as to these counts and that they are entitled to judgment as a matter of law. The Court therefore GRANTS summary judgment in favor of the Scotts on Counts V and VI of the Counterclaim, and DENIES the Defendants' motion for summary judgment as to those counts.

## CONCLUSION

Based on the foregoing, the entry will be:

Plaintiffs' motion for partial summary judgment is GRANTED in part and DENIED in part as follows: Plaintiffs' motion is GRANTED as to Count III and Count IV of the Amended Complaint and all Counts of the Counterclaim. Plaintiffs' motion is DENIED as to Counts I and II of the Amended Complaint.

Defendants' motion for summary judgment is GRANTED in part and DENIED in part as follows: Defendants' motion is GRANTED as to Count I and Count II of the Amended Complaint. Defendants' and DENIED as to Count III and Count IV of the Amended Complaint and as to all Counts of the Counterclaim.

Each party is ordered to pay its own costs and attorney fees.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: 6/8/18

Richard Mulhern
Judge, Business and Consumer Court

Kimberly B. Scott,
and Thomas H. Scott

v.

Fall Line Condominium Association,
Neil L. Weinstein, Esq.


## Plaintiffs

Kimberly B. Scott,
and Thomas H. Scott

**David Johnson, Esq.**
**Daniel Rosenthal, Esq.**
One Canal Plaza Suite 600
Portland, ME 04101


## Defendants

Fall Line Condominium Association,
Neil L. Weinstein, Esq.

**Adam Taylor, Esq.**
30 Milk Street, 5th Floor
Portland, ME 04101